Filed 9/26/13  A.P. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| A.P.,<br><br>　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF HUMBOLDT COUNTY,<br><br>　　　Respondent;<br><br>HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>　　　Real Parties in Interest. | A138385<br><br>(Humboldt County<br>Super. Ct. No. JV070282-1 AND JV070282-2) |

　　　A.P. filed this petition for writ of mandamus to challenge juvenile court orders terminating reunification services and setting a permanency planning hearing regarding her daughters.  She argues the juvenile court erred in failing to return the children to her custody, denying further reunification services, improperly applying a best-interests standard to the matter, and denying visitation with one of the children.  We will remand the matter for reconsideration of the visitation order and in all other respects affirm the orders.

## STATEMENT OF THE CASE AND FACTS

　　　Abagail B. and Brianna B. were initially taken into protective custody in December 2007, when they were eight years old and four years old respectively.  The

1

Welfare and Institutions Code section 300[1] petition alleged that petitioner had failed or was unable to supervise or protect the children adequately. Petitioner had been living in a motel room with Abagail, Brianna, her two older daughters (Latasha, age 15, and Katrina, age 13), her boyfriend Timothy P., and an adult woman. Petitioner made arrangements for someone to care for the younger girls so she could enter a detoxification program, but after several days, the caregiver decided she could no longer care for the children and was unable to contact petitioner. Over the preceding few months there had been reported incidents of domestic violence in which petitioner was injured, and admitted drug and alcohol abuse by petitioner, Timothy, and the two older children.

By the time of the detention hearing, petitioner was living with her older daughters and Timothy in his small, one-room house. The Department of Health and Human Services (Department) found the home too small for two adults and four children, and recommended that Abagail and Brianna remain in placement, and the court so ordered.

The jurisdiction report related that petitioner had led a transient lifestyle, living with the children in a van and then in the motel room. She had admitted using drugs and being an alcoholic; she had attempted sobriety at least three times in the preceding nine months but had relapsed. Timothy also admitted drug and alcohol use, and there had been domestic violence incidents, including fights in which he bruised petitioner's arm and pointed a gun at the children. Petitioner admitted that she had tolerated the older girls using drugs and having sexual relations, and that they were beyond her control.

On January 7, 2008, petitioner admitted an amended petition alleging that she and Timothy had a history of substance abuse and fighting in front of the children, that the family did not have adequate financial resources, that petitioner was living in a studio apartment that was too small for the entire family, and that Latasha had testified that she was molested by the younger girls' father Barry B.

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise specified.

The disposition report described the problems requiring intervention as including petitioner's history of drug and alcohol abuse, domestic violence between petitioner and Timothy and between the older siblings, the older siblings making the younger ones use marijuana, the children being exposed to petitioner's and the older siblings' sexual activity, petitioner's inability to provide a suitable home for the family and the minors' father not providing support. The Department reported that petitioner had divorced the children's father after Latasha disclosed his having molested her. Petitioner then struggled as a single parent with help from her grandmother. After the grandmother died in February 2007, petitioner struggled with alcohol and drug addiction. The Department reported that petitioner and Timothy were cooperative and exhibited willingness to resolve their problems, and both were remaining clean and sober. Petitioner was attending counseling sessions at the Healthy Moms program and attending AA meetings. She was motivated to keep her family together, and the minors were bonded to her and comfortable in her presence. Petitioner had weekly visits with the children. Abagail had stated that she wanted to live with petitioner but not with Timothy. The Department recommended continued placement for the children and reunification services for petitioner. On February 25, 2008, the court declared the children dependents, authorized foster care placement and ordered reunification services.

For the August 2008 status review hearing, the Department reported that the family was making "good progress in achieving case plan goals." Petitioner and Timothy had moved into a "roomy" four-bedroom house with sufficient space for the family, the children were visiting daily and staying overnight three times a week, and the visits were going "very well." Petitioner and Timothy had completed seven weeks of parenting classes and demonstrated their ability to parent consistently and adequately as well as their commitment to remain drug free and attend AA meetings. Petitioner had graduated from Healthy Moms, the whole family was participating in Family Functional Therapy, there had been no further law enforcement involvement with the family and the older girls were living in the family home and doing well. Abagail was seeing a counselor and

3

doing well; Brianna did not seem to need counseling. Both girls were happy, well-adjusted and "very vocal about wanting to return home." The social worker opined that petitioner and Timothy were capable of maintaining a stable home for the family with the support of community resources they had acquired, and recommended that the girls be returned home with family maintenance services. In accordance with the Department's recommendations, the court found that return of the children would not create a substantial risk of detriment, continued the children as dependents and ordered family maintenance services.

At the next review hearing, in February 2009, the Department reported that the children were living with petitioner and Timothy, who had "provided for their needs and created a loving home environment," and appeared happy and without complaint toward petitioner. Abagail "continue[d] to have a problem with anger as she had in the past," becoming "very angry" at her older sisters and "overly frustrated" with Brianna. Petitioner was making arrangements for counseling for the girls. After incidents at the end of the summer, petitioner had pled nolo contendere to a count of misdemeanor battery against Timothy (Pen. Code, § 243, subd. (e)(1)) and had been sentenced to three years of probation with conditions including a 52-week domestic violence program and community service. She had begun counseling for her anger management issues, was seeing a doctor about her panic attacks, was participating in weekly counseling, and had enrolled in an anger management class. Arrangements for the family to participate in parenting education did not work out because petitioner did not respond to the therapist in time, and petitioner was looking for an alternate program to help her improve her parenting techniques, especially when the children were fighting or angry. In accordance with the Department's recommendations, the court continued the dependency and family maintenance services.

For the next review hearing on August 3, 2009, the Department reported that the children were happy and well cared for, with petitioner having ensured they attended school regularly and "created a warm and nurturing home environment." Petitioner had

4

married Timothy and the family was "financially stable," with petitioner working part time and Timothy working intermittently. There had been two incidents of domestic violence between petitioner and Timothy that required law enforcement intervention. Abagail's anger problems had improved "somewhat" but she continued to be "frustrated" with Brianna. She was in counseling, and Brianna was being referred for counseling. Petitioner's older daughters were on probation, having been in and out of juvenile hall due to delinquent behavior and fighting with peers. Petitioner had not completed the conditions of her probation and a revocation petition had been filed: After attending 16 sessions of a domestic violence program, she stopped attending and was terminated, then failed to appear at an appointment to reenroll, and she had been terminated from a community service work program three times. Petitioner indicated that she missed her appointment because of appointments with her doctor and at the Welfare Department, and that she was beginning community service at a local church and intended to reenroll in the domestic violence program. She explained that she had a number of health problems requiring on-going treatment, which at times caused excessive fatigue and required emergency trips to the doctor. Timothy also had chronic medical issues and had recently suffered a relapse in his heroin addiction that required hospitalization. He was participating in an addiction treatment program and in counseling to help him with anger management and relationship problems. The Department recommended continuing family maintenance services, noting that the family had a number of serious problems that could place the children at risk for abuse or neglect but that petitioner and Timothy indicated they were committed to resolving their problems, had support networks to rely on and were cooperative with the Department and the probation department. The court continued family maintenance services, and the case plan was modified to add that petitioner and Timothy participate in "Functional Family Therapy."

On November 2, 2009, the Department filed an interim review report recommending termination of the dependency. The family was participating in Functional Family Therapy and monthly meetings to coordinate services. Petitioner had

5

completed her community service and was trying to obtain the referral and fee needed to reenroll in the domestic violence program. She had missed a pretrial hearing on the probation revocation, apparently due to confusion over the time of this hearing and a court hearing for Katrina, and the resulting $5000 warrant had been stayed pending a hearing. Petitioner had started attending AA meetings and both parents had been testing negative for all drugs except marijuana, for which both reported having medical marijuana cards. Although the family was continuing to struggle with "multiple stressors" —petitioner's and the older girls' legal problems, drug, alcohol, anger management and health issues —and the challenge of maintaining a schedule crowded with appointments aimed at resolving these issues, the living situation was stable, the children were well-cared-for, and petitioner and Timothy were motivated and receptive to services. The social worker expressed hope that the "parents' ability to make needed improvements will be driven by their own internal motivation to succeed."

The court indicated a section 388 petition for modification would be needed to terminate the dependency and maintained the February 1, 2010, date previously set for review of the case.

In its February 1, 2010, status review report, the Department recommended an additional six months of family maintenance services. The Department reported that the family's living situation continued to be stable, and the home "neat and well kept." Abagail and Brianna were both happy and sociable, but both were failing to complete academic assignments and needed the parents to be more involved with homework. Seventeen-year-old Latasha, four months pregnant, was living at home and her fiancée was frequently present; Katrina was in custody. Petitioner was a fulltime homemaker, had been attending weekly 12-step meetings and had begun to attend individual, then group, sessions of the domestic violence program. She reported "serious health issues," requiring her to take medications with "considerable side effects." She had a medical marijuana "recommendation card," apparently due to the annual cost of a Penal Code section 215 medical marijuana card, and tested negative for all substances except

6

marijuana. The social worker reported that in addition to their struggle with the previously identified stressors, the family faced the "new challenges" of Latasha's pregnancy, additional incidents with Katrina, and the children's academic problems. The social worker stated that the family had begun to demonstrate its ability to address family problems appropriately, but more time was needed "to insure that the gains realized by the family in the past several months are solidified." The court continued the children as dependents, continued family maintenance services and set an interim review for April 5, 2010.

As of the interim review, Abagail's academic progress had improved "remarkably" while Brianna's had initially improved, but then started to drop off again. Petitioner had completed 23 of the 52 weeks of the domestic violence program. She and Timothy had been having relationship difficulties and considered divorce, but decided against it after applying some of the communication skills they had been learning in therapy. A flare-up of health problems had caused petitioner to remain in bed; she missed sessions of the domestic violence program for this reason and due to a doctor's appointment for Katrina, putting petitioner at risk for termination from the program and, in consequence, problems with probation compliance. The Department reported that the family was making constructive use of resources that help them overcome their challenges and was learning to respond appropriately to problems, make improvements and continue "on the path toward the goal of functional daily living."

On May 12 and again on June 11, 2010, petitioner was arrested on charges arising from domestic violence against Timothy; she was in custody for three days following the first incident and 13 to 14 days after the second one. During the preceding months, petitioner and Timothy had attended couples counseling, petitioner had continued participating in the domestic violence groups, and Timothy had continued individual counseling through a domestic violence treatment program. On June 18, Timothy told the social worker he had arranged for an emergency protective order to keep petitioner away from him and the house. Since her release from custody around June 25, petitioner,

Abagail and Brianna had been living with a friend of petitioner's. She expressed desire to find independent housing and not continue her relationship with Timothy. Latasha continued to live with Timothy and Katrina remained in custody. Petitioner planned to seek employment and had begun to take steps toward securing housing; the "practical realities of establishing a sufficient income and a place to live are foremost in her mind." She had decided to cease efforts to preserve her marriage because continuing a relationship that led to repeated domestic violence and arrests would "defeat the purpose of creating a safe and nurturing environment for the children." As recommended by the Department, the court ordered continued family maintenance services for petitioner.

Family maintenance services were again continued at the next review hearing on February 14, 2011. At this time, petitioner was living in a clean and sober residence, where she was the house manager. She was employed 24 to 40 hours per week, had completed the domestic violence program, and was attending the Healthy Moms program, which included weekly individual counseling. Abagail and Brianna were living with Timothy; they could only be at the clean and sober home part time. Petitioner and Timothy had filed for divorce and petitioner communicated with him about the girls but otherwise maintained her separation from him. Petitioner wanted to care for Abagail and Brianna full time. She expected to complete the Healthy Moms program in April and then be able to work a second job, which would allow her to move into independent housing with Abagail and Brianna. Latasha had been incarcerated and had new domestic violence charges pending, and her baby was in foster care. Katrina was due to be released from custody pending a suitable foster placement. Brianna was repeating first grade and was at or near grade level; she had some difficulty sitting still and focusing, and appeared anxious at times, but was sociable and had made new friends at school. She told a clinician that she missed her mother a lot. Abagail was receiving speech therapy. She appeared friendly and sociable but reported feelings of sadness. She wanted counseling and had been referred, but an assessment had not been made because

8

petitioner did not respond to seven calls and a letter from the clinician trying to schedule it.

The Department recommended continuing family maintenance services because, although petitioner had made "good progress" in establishing personal independence and separating herself from the problems that led to domestic violence charges, she had not yet established a living situation that would let her care for the children full time. Petitioner needed to be more available to make arrangements for the girls' care, and the social worker was concerned that she could jeopardize her progress in her efforts to help her older daughters.

By the next review hearing on August 15, 2011, petitioner had reunited with Timothy and moved back into the family home with him, the younger girls, and Latasha. Petitioner was working fulltime and reported being clean and sober since August 2010. She had not completed phase two of the Healthy Moms program due to what she and "to some extent" the program described as competing demands of her employment, but she attended a noon recovery meeting at her church when her schedule permitted. Brianna had been diagnosed with an adjustment disorder with anxiety and had not received consistent mental health services due to a combination of changes in personnel at Children, Youth and Family Services and variable follow-through by petitioner, but weekly appointments for family therapy had been scheduled. Abagail reportedly "approve[d] of and affirm[ed] her mother moving back into the house." The Department recommended termination of the dependency and the court so ordered. The final judgment terminating the dependency was filed on September 8, 2011.

Four months later, on January 10, 2012, Abagail and Brianna were again taken into protective custody; a new petition was filed on January 12 alleging the girls were at risk of serious physical harm or illness due to petitioner's failure to protect (§ 300, subd. (b)) and at risk of serious emotional damage as a result of petitioner's conduct (§ 300, subd.

9

(c)).[2] According to the detention report, Abagail had been found walking by herself in Eureka, visibly upset, and said she had gone "home" to the motel where the children were living with petitioner and Latasha but found no one there. She said that petitioner and Latasha had been smoking pot and drinking alcohol and had different men coming in and out of the room. Abagail had awakened in the middle of the night to find a man from another motel room in bed with petitioner, and yelled at him to stop touching her mother. Her teeth had been hurting, she had sores in her mouth and had been sick for five days, but petitioner refused to take her to the doctor, and there was no food. She said petitioner was supposed to pick Brianna up from the Boys and Girls Club at 6:00 p.m. When Brianna was asked if she and Abagail were left alone, she said "their mother watches them every minute." Both girls described an incident in which petitioner got drunk and passed out.

There had been three referrals to the Department since September. On September 15, it was reported that Timothy was calling the children inappropriate names, walking around naked in front of the children, and excessively drinking alcohol, and had kicked the family out of the house. On October 4, it was reported that Brianna had witnessed a physical altercation between petitioner and Latasha in which petitioner suffered a black eye, and a verbal altercation, and that Brianna was afraid her mother or sister would get seriously hurt or killed. On October 24, it was reported that Abagail begged to remain with friends she was staying with because she had nowhere to go. Prior to the motel where they were staying when the girls were taken into protective custody, petitioner and the children had been living in a van and at the Rescue Mission.

An amended petition was filed on February 14. Reports for the jurisdictional hearing related Abagail's statements to the social worker that petitioner tried to take her to the doctor but could not because she did not have gas or bus tickets. Abagail said she had to take care of petitioner so petitioner could take care of her and Brianna. She

---

[2] The petition additionally alleged that the children's father was unable or unwilling to care for them. (§ 300, subd. (g).)

wanted to live with petitioner and her sisters somewhere other than the motel. Abagail felt it was her job to watch out for her family and felt like "grabbing her mother by the collar of her shirt, and smacking her a few times in the face and telling her to wake up." After a hearing on February 29, the court sustained the petition with certain modifications to the allegations.

The disposition hearing was held on April 17. Brianna had been moved to a different foster home because the previous one was no longer able to support her; Abagail had asked to remain in the initial placement despite her sister moving. Abagail was reported to be feeling safe and secure for the first time in a long time and no longer assuming a parentified role for Brianna, but was experiencing discord with Brianna as a result. The mental health care manager was working with the girls. Abagail told the social worker she wanted a break from visiting with petitioner and Brianna. Brianna was displaying "emotional and behavioral concerns" as a result of her experiences of "instability and rejection" and was receiving support from her mental health clinician. Petitioner had attended 14 of 23 offered visits, and ended three early. The lack of consistent visitation was taking a toll on the children. Abagail had refused to be taken to visits on two days because of petitioner's failure to show up for the prior two visits; Brianna had refused to leave the visitation center on one occasion despite petitioner's non-attendance because she wanted to see her mother. Petitioner had participated "minimally" in recommended services: She applied for the Healthy Moms program on February 17 but never returned; drug-tested once in March and was negative for all substances; had to leave her clean and sober house because she was not complying with the rules; and was not maintaining contact with the Department. The Department requested a 90-day interim review hearing, the social working stating that "[b]oth girls love and miss their mother but cannot wait forever for her to decide to begin services." Basing the decision to remove the children on petitioner's "failure to protect the minors and failure to meet their dental and mental health needs," the court declared the girls dependents and ordered reunification services. The case plan required petitioner to

11

participate in counseling services, to acquire and maintain safe housing for herself and the children, protect the children from and not involve them in domestic violence, demonstrate her willingness and ability to meet the children's medical needs, refrain from using illegal substances or alcohol, participate in a substance abuse program, attend at least three AA meetings a week and agree to drug testing.

Reunification services were continued after the six-month review hearing on October 16, 2012. Petitioner had not visited either of the girls since May and had not contacted the Department since June. Petitioner called Abagail in mid-June and said she was stuck in Redding; in September she contacted Abagail by Facebook and text, saying she was ready to try reunification again and "wanted to 'do it right this time.' " Abagail was well-liked by her current foster family, was having a successful year at a new school and reported feeling safe in her home and neighborhood. Brianna was well liked and strongly supported by her foster family but had significant behavioral issues that impacted her placement and education. Both girls were in therapy. Sibling visitation had been suspended in April at Abagail's request but the girls were now requesting more time together. Both wanted to see petitioner and were very protective of her. The social worker stated that it would be "emotionally traumatizing" to the girls if reunification services were not extended another six months. While petitioner had "basically disappeared" and not complied with any aspect of her case plan, "she too has had a life shaped by hardship and trauma," and her recent contact with Abagail indicated a wish to engage in services again.

In February 2013, the Department submitted its 12-month status review report recommending continuation of reunification services. Petitioner had reengaged in services as of January 8, 2013. She had been living at an all women's clean and sober house since November 30, 2012; had maintained sobriety since December 1; was actively participating in the 12-step program and in a faith based support group for drug and alcohol intervention; had maintained regular contact with the Department and was "very open to instruction and teaching." The social worker reported that petitioner had made

12

visits with Brianna "a wonderful and safe place" and "by all accounts" visitation with petitioner had been a positive influence for Brianna. Brianna continued to struggle with behavioral issues but was "thriving" in her current placement. She expressed wanting to be with petitioner. Abagail was an established member of her foster family and was doing well in school and personally; she felt a strong need for reunification services to end and wanted to be adopted by her foster parents. She felt petitioner would repeat the pattern Abagail had lived with all her life, doing well for a while, then falling back into old habits. Abagail felt the Department was setting Brianna up for "more devastation" because the visits with petitioner would make her "hopeful for a future where she is reunified with her mother," and wondered, "Why can a 13 year old see this when the social workers can't?" Petitioner had respected Abagail's stated wish for no contact. Petitioner felt she needed to strengthen herself as a person and continue to work on her sobriety before she would be able to assume the responsibilities of parenting. The social worker related petitioner had reengaged in substance abuse support services, sought housing in a women's clean and sober home and obtained individual therapy before contacting the Department; when she made contact, petitioner thought the girls had already been adopted and was seeking a way to reconnect with them. The social worker believed that people with substance abuse issues have a higher chance of long term success when they choose sobriety and seek assistance rather than being required to follow a case plan, and that petitioner had chosen to be sober for personal reasons. The Department recommended continuing services because petitioner had been making progress since January, extra time would give Abagail the opportunity to resolve some of her anger and heartache regarding petitioner, and Brianna was enjoying visits with petitioner.

Brianna's Court Appointed Special Advocate (CASA) agreed with the Department's recommendation. Abagail's CASA did not file a report. Counsel for the children, however, urged terminating reunification services and setting the matter for permanency planning. Counsel informed the court that Abagail wanted to address the

13

court directly, and that although Brianna expressed wanting to continue reunification, counsel believed this would not be in her best interest. Counsel noted that the children had been in the dependency system since 2007, that the present case was initiated only months after the first dependency case was dismissed, and that in light of petitioner's initial response to the present case, her recent interest in reunification did not indicate a likelihood of long-term success.

At the hearing on April 3, Abagail personally addressed the court with reasons she felt petitioner should not receive further services. Although she loved petitioner and was happy that petitioner was currently doing well, Abagail said that her mother would do well and then "right when she's about to hit the goal, she knocks down." Abagail was "tired of thinking that I can trust my mom again and her failing me and then me feeling like I was stupid for doing that." She wanted to be adopted by her foster family and have a stable home, without the doubt created by continuing services to help petitioner regain custody. Abagail did not feel petitioner loved her because she did not protect her. She felt she had her childhood taken from her, describing being homeless with petitioner "always drinking, doing drugs" and "upset and crying her eyes out, blaming me for every little thing which I tried my hardest to make life as great as possible living in a small van with a bunch of stuff, cold, hungry all the time." Abagail stated that petitioner had an "EBT card" (Electronic Benefit Transfer) she could use to get food, but according to her older sister, went to men's houses and had sex with them for money for food or gas, and that the van was parked in an alley where she felt so unsafe that she did not sleep for a week. She described Brianna "running around with no shoes on," at risk of getting cut or getting a disease, and felt upset at the prospect of her sister also losing her childhood: "I don't care about my childhood anymore, you know, because that's all gone; but she still has a chance. I'm upset that she didn't get to have little tea parties or little sleepovers with her friends because she had to worry about getting safe, being warm, getting food, if mom's not going to come home that—come to home —like, home, van, whatever you call that, that night, or if mom is okay in a man's house." Abagail was trying to "get over

14

this and move on," and every time she came to court it hurt her to relive it all. She stated, "[W]hen she has a chance to show that she was a mom, she failed. And since then, now that she doesn't have to worry about us or, oh, is my kids going to get food or whatever she worries about, she can do whatever she wants. And so she shows you guys that she's doing good and that's because she doesn't have us at all. She told me one night that if we weren't born, she'd have a way easier life. Trust me, that did not feel good."

Petitioner testified that to be eligible for New Life Transition Housing, where she had lived since November 30, 2012, she had to be clean and sober and attend meetings at least three times a week. She continued to abide by the requirements of the house, attending at least one or two AA and NA meetings a day and weekly group house meetings, and submitting to drug testing. She had been participating in a 12-step program for three weeks and in a drug and alcohol intervention and prevention program since mid-December, attending each weekly. Petitioner testified that her program had helped her understand that for most of her life she had denied having been a victim of abuse as a child, using drugs to cover up her feelings, and the program had given her a chance to "break away from . . . those binds and learn how to be an adult." Although not required to do so, petitioner had been attending weekly group therapy sessions for domestic violence victims for two months. She had also graduated from 104 weeks of anger management classes. Petitioner had been attending church on Sundays since mid-December, which she also saw as part of her recovery.

Asked why this time was different from the past, petitioner testified that she was "doing this for [herself]," that she did not plan on returning to Timothy and was working on divorce papers, that she was tired of hurting herself and others, and that regardless of whether she regained custody of her children, she wanted to change her life and be a better person. Regarding Abagail's statement to the court, petitioner stated that she wanted to do what Abagail felt she needed, even if that meant discontinuing services with petitioner and being with her foster family. Petitioner took responsibility for being unable to provide a home for the children when Timothy kicked them out, but testified

15

that becoming homeless was not her fault: Timothy kicked them out, she lost her job because she was trying to get the children to school and had no one to help, but she did not have sex with people to pay for food. She recognized that the things that happened were "horrible" but testified that she did the best she could with what she had.

The Department took the position at the hearing that petitioner had made significant progress in her case plan for the past four months, had consistently visited Brianna, and had the ability to complete the case plan and regain custody of at least Brianna by June 11. The children's attorney argued that the last four months had to be considered in light of the preceding eight months in which petitioner did nothing to comply with her case plan. Counsel noted that petitioner's testimony focused on her acceptance of her substance abuse but made excuses, rather than accepting responsibility, for the homelessness and the children's fear during that time. Counsel viewed this, as well as petitioner's indicating her anger management classes and domestic violence group were not required by her case plan when in fact they were, as indicating petitioner had not substantially complied and made substantial progress with the case plan. Counsel emphasized that the present case was initiated only months after the first dependency case was closed, for exactly the same problems that led to the first case. Counsel argued that there was not a substantial likelihood of Abagail returning to petitioner's custody by the end of the 18 month period: "[T]he damage has been done, and I don't think that the recent acts by mother, as good as they are or as good as they are appearing to be, are enough." Counsel felt services should be terminated for Brianna despite Brianna's desire to reunite with petitioner, because Brianna should not have to experience what her older sister did. Counsel argued that petitioner's actions showed she was not capable of long term success, there was a very high likelihood the same patterns would be repeated, and that would cause Brianna more trauma than terminating services and setting a permanent plan for both children. Petitioner's counsel urged that the past history of the case was well known at the six month hearing, when reunification services were extended despite petitioner's then non-compliance with her case plan on the court's finding that additional

16

services would provide a probability of return, and during that next reporting period, petitioner was making significant progress. Counsel noted that Brianna's CASA, as well as Brianna herself, agreed with the Department's recommendation for continued services, and that the detriment of terminating services recognized at the six month hearing continued to apply, including for Abagail and the opportunity for her to resolve her feelings about her mother. Like the social worker, petitioner's attorney stressed that petitioner had chosen her current path of recovery of her own initiative, despite believing it was too late to reunify, and that this increased the chances of long term success.

The court declined to follow the Department's recommendation. Stating that it is necessary to look at the past because there is no "crystal ball to see what the future holds," the court took issue with a position that appeared to encourage a parent to "disappear" for the first eight months of a case and then "pop up in the last three months and be perfect," and receive additional services. The court noted the "tortured history" of the case, with the children first removed in 2007 and what might be "the longest family maintenance case that we had for a long time," with services from 2008 until August of 2011, followed by new referrals beginning less than two months after dismissal of the first dependency case, and removal in January 2012. The court further noted that when the first dependency was terminated, the reports relied heavily on the belief that petitioner knew how to and would continue to access services, but that despite having worked with the system for years, she did not make any contact for support until January 2013.[3] The court stated, "[I]ronically[,] what Brianna is saying now is what—is almost identical to what Abagail said three years ago. But Abagail said those things and felt those things and then trusted and then didn't have those things happen and then had things fall apart again." The court also commented that the discussion in the reports of Brianna's

---

[3] The court referred to "January 2012" but the record makes clear that the intended reference was "January 2013": As described above, when the children were removed in January 2012, petitioner was not in contact with the Department and she reengaged in services as of January 2013.

struggles with issues around abandonment and trust showed the child had been harmed by the events of her life.

Addressing the questions required to be determined at the 12-month hearing, the court found it was "replete in the report" that "return of the children to the physical custody of the parent would create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being." The court found reasonable services had been offered. Finally, the court found there was not a substantial probability the children would return by the 18-month date because it could not feel confident of petitioner's long-term success: The court acknowledged it could hope, and there was "some possibility" things would be different than the last time the dependency was terminated, but there was not a "substantial" probability. Considering the factors bearing on this last question, the court found petitioner had not "consistently and regularly contacted and visited the children"—she had done so "[l]ately" but "not throughout the period of time." Regarding the problems that led to removal, petitioner had "done a lot toward her addiction, but there are other issues that haven't been substantially addressed." She had not "demonstrated the capacity and ability to complete the objectives of the case plan and to provide for the children's safety, protection and special needs."

Commending petitioner for the progress she had made in her recovery, the court stated that at a 12-month hearing the focus had to shift to what the children needed to be happy and healthy adults. The court terminated reunification services, set and a hearing for April 30 regarding certain deferred findings and an updated case plan, and set the section 366.26 hearing for July 31.

Petitioner filed notices of intent to file writ petitions in both matters on April 9, 2013.

The addendum report submitted by the Department on April 16, and a second addendum report submitted on April 23, recommended a permanent plan of adoption for Abagail and unsupervised visitation with petitioner for a minimum of one hour per month "if appropriate to Abagail's emotional and mental well-being. Abagail is not required to

visit should she choose not to."[4]  At the hearing on April 30, the court found a permanent plan of adoption appropriate for both children and ordered visitation "as outlined in the case plan."  The record contains no addendum report, case plan or written findings and orders concerning Brianna.

## DISCUSSION

### I.

Section 366.21, subdivision (f), states a presumption that a dependent child shall be returned to parental custody unless the trial court finds a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being.  Petitioner contends the court here erred in failing to return the children to her custody because there was no substantial evidence of such risk.  "We review the juvenile court's finding of substantial risk of detriment for substantial evidence, which means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.] In the absence of substantial evidence showing such detriment, the court is required to return the minor to parental custody. [Citation.]' "  (*In re E.D.* (2013) 217 Cal.App.4th 960, 966, quoting *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.)

Pursuant to section 366.21, subdivision (f), at the 12-month permanency review hearing, the juvenile court "shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . .

---

[4] At the April 30 hearing, petitioner's counsel urged that the second addendum report changed from recommending visitation to providing for no visitation, without a showing of detriment.  Counsel for the Department and the minors argued the basis for finding visitation detrimental was Abagail's testimony at the April 3 hearing and supported the modification.  The second addendum report that appears in the record contains the same visitation provision as the first, without revision to preclude visitation.

The court shall also determine whether reasonable services that were designed to aid the parent or legal guardian to overcome the problems that led to the initial removal and continued custody of the child have been provided or offered to the parent or legal guardian. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental.  In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5, shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided . . . and shall make appropriate findings pursuant to subdivision (a) of Section 366."  The required findings under section 366 include "[t]he continuing necessity for and appropriateness of the placement," "[t]he extent of the agency's compliance with the case plan in making reasonable efforts . . . to return the child to a safe home and to complete any steps necessary to finalize the permanent placement of the child" and "[t]he extent of progress that has been made toward alleviating or mitigating the causes necessitating placement in foster care." (§ 366, subds. (a)(1)(A), (B), (E).)

Relying upon the principle that a parent's substantial compliance with the case plan may be sufficient to overcome a finding of substantial risk of detriment (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341, 1343), petitioner asserts that the evidence not only failed to support the court's ruling but in fact demonstrated the absence of such risk.  She points to the Department's recommended finding that she had made "adequate" progress toward alleviating or mitigating the causes necessitating out-of-home placement  and states that the evidence shows she complied with the requirements of the case plan imposed at the six month hearing that she participate in counseling and substance abuse services, secure housing and maintain her children's medical needs. Specifically, petitioner notes that she re-engaged in services by November 30, 2013; secured safe and stable housing at New Life Transitional Housing, a program that

20

required her to have achieved sobriety before entry and to attend weekly meetings, submit to random drug testing, attend NA/AA meetings and comply with household participation requirements including chores and group sessions; had been actively participating in weekly programs for drug and alcohol intervention and prevention and domestic violence; had completed an anger management program; and had obtained individual therapy prior to re-engaging in services. Although Abagail refused visits, petitioner had consistently and regularly visited Brianna; according to the Department's report, petitioner was open to instruction and teaching and had made the visits "wonderful," "safe" and a "positive influence" for Brianna. Petitioner further emphasizes her testimony regarding the insights she had gained and her desire to change for her own benefit despite the belief that it was already too late to regain custody of her children; acknowledging her prior substance abuse; taking responsibility for her prior inability to provide housing for the children; and recognizing and respecting Abagail's concerns and wishes.

The juvenile court recognized and commended petitioner for the progress she had made in her recovery over the four months preceding the hearing. Its detriment finding, however, was appropriately based on the entire history of the case.

Abagail and Brianna had been dependents of the court since 2007, save for the few months between termination of the first dependency case and initiation of the present one. By the time of the hearing in April 2013, petitioner had received services—reunification or family maintenance—for over five years. Despite making progress at some points, she had repeatedly fallen into patterns that left the children at risk and caused them to suffer at least emotional harm. Over the course of these years, petitioner had never managed to care for the children without abundant outside support and services. After the first dependency was terminated, it was only a month before the first new referral to the Department, and only five months before the children were again taken into protective custody. Despite all the previous years of services, petitioner effectively disappeared from the children's lives for the first eight months of the current dependency. While she

21

had recently made progress, there was absolutely no evidence petitioner would be able to maintain that progress if she was also responsible for the children—as Abagail expressed at the hearing, history indicated the opposite. Even petitioner recognizes that it was too late for reunification with Abagail. The truly difficult question for the court concerned Brianna, who expressed wanting to reunify with her mother but was clearly suffering the effects of the years of petitioner's failure to protect and care for her: The Department's reports discussed Brianna struggling with emotional and behavioral concerns— significant enough to have impacted her placement and education—resulting from her experiences of "instability and rejection," and the court particularly noted these issues. The evidence supported the court's finding of substantial risk of detriment. Additionally, petitioner's argument that the court should have returned the girls, or at least Brianna, to her custody ignores the fact that she could not have assumed custody at that time—she was living in a program where she could not have them full time and presented no evidence of what living situation she might be able to arrange for the future.

## II.

Alternatively, petitioner contends that if the children could not be returned to her custody immediately, the trial court should have continued reunification services for an additional six months, at least as to Brianna. Under section 366.21, subdivision (g)(1), if a dependent child cannot be returned at the 12-month hearing, the court may continue the case for up to six months, provided the hearing occurs within 18 months of the original detention. The court may continue the case "only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (§ 366.21, subd. (g)(1).) In order to find such a substantial probability, the court is required to make three findings: That the parent or legal guardian "has consistently and regularly contacted and visited with the child[,]" "has made significant progress in resolving problems that led to the child's removal from the home," and "has demonstrated the

22

capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A), (B), (C).)

As we have said, the trial court found that there was not a substantial probability the children would be returned to petitioner by the 18-month date because it could not be confident of petitioner's longterm success given the entire history of the case. Arguing that the evidence indicates she has the capacity and ability to complete any remaining components of her case plan and provide for the children's safety, protection, well-being and special needs by the end of the 18 month period, petitioner points to the progress she made during the course of the first dependency, ultimately leading to termination of that proceeding, and to the children having been described as well cared for "throughout the case." What petitioner neglects, however, is the obvious fact that despite her progress, and the periods in which the children were found to be doing well in her care, she was never able to *maintain* the ability to provide and care for them—even with the support of many years of reunification and family maintenance services. The question the court asked was whether there was sufficient evidence petitioner's progress this time would be more lasting than it had been previously. At the time of the 12-month hearing on April 3, 2013, only three months remained of the 18-month period from the time the children were originally taken from petitioner's physical custody. (§ 366.21, subd. (g)(1).) The evidence fully supported the court's conclusion that while there might be a "possibility" the children could be returned to petitioner's custody within the remaining time period, there was not a "substantial probability" this would occur. As the court found, petitioner had only in the last few months of the 12-month reunification period maintained regular contact with the children, and while she had made great progress in her recovery from substance abuse, her living situation would not accommodate the children, and their day to day needs were being addressed by their foster families. The requisite "substantial probability" is that the child "will" be returned to parental custody, not just that this result might occur. (See *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 180-181

23

[contrasting standard required at 12-month hearing with that applicable at six month hearing for child under age three at time of removal, under which services must be continued an additional six months if there is a substantial probability the child "may" be returned].) The evidence supported the juvenile court's determination that there was not a substantial probability petitioner would be able to assume custody of the children (or even just Brianna) and maintain an ability to protect and care for them.

### III.

Petitioner contends the juvenile court erred in employing a "best interest of the child" standard as part of its analysis of the question whether to terminate reunification services. She urges that this standard is reflected in the trial court's statement that Brianna was currently expressing what Abagail had said three years before, and Abagail "said those things and felt those things and then trusted and then didn't have those things happen and then had things fall apart again." Petitioner views the court as sharing the sentiment expressed by minors' counsel, who urged that there was not a substantial likelihood of reunification for Abagail because of the child's express desire to end reunification services and "move forward with her life," and that termination of reunification services was "what's best for Brianna," despite the child's wish to reunify with petitioner.

Petitioner is correct that the question of "best interest of the child" does not come into play at the 12-month hearing. "As explained in *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788, ' "[t]he focus during the prepermanent planning stages is preserving the family whenever possible [citation] whereas the focus after the permanent planning hearing is to provide the dependent children with stable, permanent homes." (*In re Michael R.* (1992) 5 Cal.App.4th 687, 695–696.)' Similarly, in *In re Stephanie M.* (1994) 7 Cal.4th 295, 317, the court noted that '[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point "the focus shifts to the needs of the child for permanency and stability" [citation], and in fact, there is a rebuttable presumption that

24

continued foster care is in the best interests of the child. [Citation.]' " (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 507.)

In *Rita L. v. Superior Court, supra,* 128 Cal.App.4th at p. 498, the juvenile court "reluctantly" terminated reunification services for a mother who had performed "so outstandingly" during the reunification period because of a "last-minute stumble" in the mother's effort to remain drug free and because the child "likes [his] caretaker very much." The reviewing court reversed. Regarding the second basis of the juvenile court's ruling, *Rita L. v. Superior Court* explained that the child's relationship with his caretaker was an inappropriate consideration in the determination of whether to continue reunification services, becoming relevant only after the court has terminated services and turns to the question of permanent planning. (*Id.* at p. 507.) Petitioner particularly notes the *Rita L.* court's observation that "[w]hile it is understandable the court would be concerned about [the child's] future, that consideration is simply not pertinent to the determination of whether [the mother's] reunification period should be brought to a close." (*Ibid.*)

However, we disagree with petitioner's characterization of the court as utilizing a best interest of the child standard in deciding whether to terminate reunification services here. The concerns stated by the court were with the extremely long history of the case, petitioner's repeated relapses after periods of progress, the effect on the children of petitioner's repeated failures to maintain progress toward reunification, and the absence of evidence that return to petitioner's custody would be achieved within the remaining few months of the 18-month reunification period. As we have said, the court's findings that return of the children to petitioner's custody would be detrimental and that there was not a substantial likelihood of return within the remaining period were supported by the evidence.

**IV.**

Petitioner's final contention is that the court abused its discretion in denying visitation with Abagail absent a showing of detriment.

25

The Department's recommendation in the 12-month Status Review Report was for at least four hours weekly supervised visitation with petitioner "if appropriate for [the children's] individual emotional and mental health." After the court terminated reunification services and set the section 366.26 hearing, the Department filed an addendum report on April 16 that, among other things, recommended a permanent plan of adoption for Abagail and included in the case plan a provision for "unsupervised visitation with petitioner for a minimum of one hour per month "if appropriate to Abagail's emotional and mental well-being. Abagail is not required to visit should she choose not to." A second addendum report submitted on April 30 contained the same recommendation and provision for visitation. At the April 30 hearing, petitioner's counsel urged that the second addendum report changed from recommending visitation to providing for no visitation, without a showing of detriment. Counsel for the Department and the minors argued that the modification was supported by Abagail's testimony at the April 3 hearing, which showed visitation would be detrimental. The record provides no explanation for this inconsistency between the visitation provision stated in the addendum reports and counsels' discussion of a recommendation for no visitation. The court did not find make the finding that visitation was detrimental and needed to be suspended. It ordered visitation "as outlined in the case plan" and signed the written order providing for visitation "as stated in the case plan," and its minute order so reflects.

Petitioner now argues that the Department's April 16 report recommended weekly[5] visitation for both minors, with the proviso that Abagail would not be forced to visit if she did not want to; that no visitation was provided to petitioner; and that no detriment was shown to support visitation not being provided.

Section 366.21, subdivision (h), provides that after reunification services are terminated and a section 366.26 hearing set, the court "shall continue to permit the parent or legal guardian to visit the child pending the hearing unless it finds that visitation would

---

[5] The recommendations in both reports were for monthly visitation, not weekly.

be detrimental to the child." "Absent a showing of detriment caused by visitation, ordinarily it is improper to suspend or halt visits even after the end of the reunification period. (§ 366.21, subd. (h); *In re David D*. (1994) 28 Cal.App.4th 941, 953-956.)" (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.) "Courts have long recognized that, in the context of dependency proceedings, a lack of visitation may 'virtually assure[] the erosion (and termination) of any meaningful relationship' between mother and child. (*In re Brittany S*. (1993) 17 Cal.App.4th 1399, 1407.) . . . [¶]Meaningful visitation is pivotal to the parent-child relationship, even after reunification services are terminated. (*In re Julie M*. (1999) 69 Cal.App.4th 41, 49.) Under section 366.26, subdivision (c)(1)(A), the Legislature has provided a means by which even a parent to whose custody a child cannot currently be returned has a final chance to avoid termination of parental rights if she can show she has maintained regular contact and visitation with her child, and the child would benefit from continuing the relationship. Obviously, the only way a parent has any hope of satisfying this statutory exception is if she maintains regular contact with her child. As [mother] correctly points out, for the parent deprived of visitation, "it is a forgone conclusion that [she] is not going to be able to establish the exception or have any meaningful chance to avoid the termination of parental rights.' " (*In re Hunter S*. (2006) 142 Cal.App.4th 1497, 1504–1505 (*Hunter*).)

It appears from the discussion at the April 30 hearing that the parties treated the court's order for visitation in accordance with the case plan as a "no visitation" order. To the extent the court shared this view, the order was erroneous in the absence of a finding of detriment. Although the court was clearly sympathetic to Abagail's wish to cease contact with petitioner, it did not make any finding that visitation would actually be detrimental to her. The court's comments that counseling to "bring closure or resolution to this family" might be appropriate depending on the children's therapeutic needs" at least suggests the court might not have viewed visitation as *detrimental* even though it did not want to force the child to see her mother.

Moreover, contrary to the discussion at the April 30 hearing, the order that appears in the record did *not* terminate visitation for Abagail: It provided for a minimum level of visitation, although it also gave Abagail the right to decline visitation. This delegation of control over visitation to Abagail was improper. "A visitation order which fails to protect a parent's right to visit is illusory. If, as here, the court grants visitation, 'it must also ensure that at least some visitation at a minimum level determined by the court itself, will in fact occur. (*In re S.H.* (2003) 111 Cal.App.4th 310, 313.)" (*Hunter*, *supra*, 142 Cal.App.4th at p. 1505.)

*Hunter S.* involved a child who, despite there being a visitation order in place, adamantly refused visits with his mother. (*Hunter, supra,* 142 Cal.App.4th at pp. 1501–1503.) In the present case, as in *Hunter*, "[w]hile the court granted visitation in theory, none was permitted in reality." (*Id*. at p. 1505.) Like the child in *Hunter S.*, Abagail was "given virtually complete discretion to veto visitation, and indeed all contact, with [her] mother, a discretion [she] exercised without any oversight or direction by the court. This was clearly improper. The juvenile court cannot impermissibly delegate to the child's therapist, DCFS or any third person, unlimited discretion to determine whether visitation is to occur. (*In re Donnovan J*. (1997) 58 Cal.App.4th 1474, 1476–1478.) In no case may a child be allowed to control whether visitation occurs. (*In re S.H., supra*, 111 Cal.App.4th at pp. 317–318; *In re Julie M., supra*, 69 Cal.App.4th at p. 48.)" (*Ibid*.)

Whether viewed as an order terminating visitation without a finding of detriment or an order improperly delegating control over visitation to the child, the visitation order here cannot stand.

## DISPOSITION

The petition is granted as to the order concerning visitation between Abagail and petitioner. In all other respects, the petition is denied. Let a peremptory writ of mandate issue vacating the visitation order of April 30, 2013, and directing respondent court to reconsider its visitation order as to Abagail in light of the views expressed herein. The

28

previously granted stay is hereby dissolved.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(3).)


_____

Kline, P.J.


We concur:


_____

Haerle, J.


_____

Richman, J.