[No. G034876. Fourth Dist., Div. Three. Apr. 13, 2005.]

RITA L. et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in
Interest.

496

**COUNSEL**

Law Offices of J. Michael Hughes and Lawrence A. Aufill for Petitioner Rita L.

Juvenile Defenders and Donna P. Chirco for Petitioner Rocky P.

No appearance for Respondent.

Benjamin P. de Mayo, County Counsel, and Saul Reyes, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Van Duesen, Youmans and Walmsley and Robert R. Walmsley for Real Parties in Interest Norman P. and Marcy P.

Law Offices of Harold LaFlamme, Harold LaFlamme and Linda O'Neil for Minor.

OPINION

**BEDSWORTH, Acting P. J.**—In this dependency case, Rita L. petitions this court for relief from the juvenile court's order terminating reunification services for herself and her son, Blaine P., and scheduling a hearing to consider termination of parental rights.[1] The trial court reached its decision only reluctantly—after noting Rita had performed "so outstandingly" during her reunification period—because of her last-minute stumble in the effort to remain drug free. The court also considered the fact "a very troublesome case as [Blaine] likes [his] caretaker very much."

We conclude the juvenile court erred in terminating the reunification services. Rita's transgression—ingesting a Tylenol with codeine prescribed for her adult daughter while suffering in bed with a headache—was quite minor, did not escalate into any more significant drug use, and did not indicate Blaine would have been in any danger even had he been in Rita's custody at the time. More importantly, the record demonstrates the court improperly considered the quality of Blaine's relationship with his foster parents in reaching its difficult decision, tainting its decision. Finally, it appears the court inadvertently interfered with the progress of Rita's reunification plan when it precluded the social worker from exercising his discretion to release Blaine into her custody on a trial basis, without any hearing or determination of whether such a release would have been an abuse of that discretion. We therefore reverse the order and remand the case with directions either to offer additional reunification services to Rita, or release Blaine into her custody.

Blaine was born in June of 2003, with amphetamine in his system. He was taken into custody and the Orange County Social Services Agency (SSA) filed a petition to establish dependency jurisdiction based upon failure to protect (Welf. & Inst. Code, § 300, subd. (b).)[2] The petition alleged that Rita had exposed Blaine to drugs and alcohol during her pregnancy, and that she had an extensive history of substance abuse. The petition also alleged Rita had lost custody of other children in 1995, due to acts of domestic violence with those children's father, and due to the alcoholism of both parents. As to Blaine's father, Rocky P., the petition alleged he was on parole for receiving stolen property, had his own unresolved history of substance abuse, and failed to protect Blaine from Rita's drug use during pregnancy. An amended

---

[1] Blaine's father, Rocky P., filed his own notice of intent to file writ petition, but later merely joined in Rita's brief.

[2] All further statutory references are to the Welfare and Institutions Code.

petition, filed in July of 2003, alleged Rocky had been arrested again for possession of a controlled substance and violation of parole, and was incarcerated in the Orange County jail.

In August of 2003, Rita and Rocky both pleaded no contest to the amended petition. The court found the petition to be true, declared Blaine to be a dependent, and ordered reunification services provided to Rita and Rocky.

After briefly staying elsewhere, Blaine was placed in the "concurrent planning" home of Norman and Marcy P. in August of 2003, apparently with the expectation they would be likely to adopt him if reunification efforts with Rita and Rocky proved unsuccessful. In June of 2004, the P.'s filed a motion for an order declaring them to be Blaine's de facto parents, and allowing them to participate in the dependency court proceedings. No objection was filed, and the motion was granted.

After a bit of a slow start, Rita performed very well in her reunification efforts. She went into a residential drug treatment program at a facility called The Villa, and successfully completed it in May of 2004. She consistently participated in drug testing and was consistently clean. She completed a parenting program and otherwise complied with the requirements of her reunification plan. She obtained a full-time job at Wal-Mart and she and Rocky moved into a studio apartment. Rocky had also performed well after a similarly slow start.

Rita and Rocky also visited with Blaine consistently. However, conflicts developed between Rita and (more particularly) Rocky, on the one hand, and the P.'s on the other, concerning the visits. The social worker later relieved the P.'s from any role in monitoring the visitation, and assigned that role to professional staff from the agency which had placed Blaine with the P.'s. Unfortunately, some of the conflicts continued, and the social worker began to suspect that neither the P.'s nor their foster agency were supportive of Rita's and Rocky's reunification efforts. As the social worker explained, "the emotionally charged bias that has become evident on the part of the [foster agency] and [the P.'s] is counterproductive to the development of a genuine supportive relationship between the foster parents and the birth parents." The social worker ultimately took over all responsibility for visitation personally.

The 12-month review was initially scheduled to commence on August 8, 2004. In preparation for that hearing, SSA prepared a report describing the progress made by Rita and Rocky, and noted "[t]he distinct possibility exists

for the child to begin a sixty-day extended visit on or around this hearing date." The 12-month hearing was then repeatedly continued for a period spanning several months, pursuant to stipulations.

During the period encompassed by the continuances, several things happened. First, Blaine began overnight visits with Rita and Rocky in August, and the visits went well. Second, in September of 2004, Rocky turned himself in to the Orange County Sheriff's Department in response to a warrant alleging failure to appear on a charge of driving without a license at some point in the past. It appeared he was likely to be sentenced to up to two years in state prison. Third, on October 5, 2003, SSA informed minor's counsel of a tentative plan to return Blaine to Rita's custody for a 60-day trial release beginning on October 14.

Then, on October 13, 2004, minor's counsel filed an ex parte motion pursuant to section 388, requesting that the court preclude SSA from carrying out its announced plan to release Blaine into Rita's custody for the 60-day trial period. After hearing argument on that day, the court determined the issue required "further hearing," granted Blaine's counsel's request that the trial release not be commenced on October 14, and continued the hearing until October 19, 2004, which was, at that point, the date scheduled for the 12-month review.

The hearings were again continued until November 2, 2004, and were then trailed and again continued. The 12-month hearing finally commenced on November 18, 2004, over three months after it was initially scheduled. At the beginning of that hearing, minor's counsel requested that no trial release be commenced until the conclusion of the 12-month hearing. The court agreed.

In connection with the 12-month hearing, SSA reported that Blaine had begun visiting with Rita alone from Thursdays to Saturdays, without incident, beginning in October. The social worker continued to recommend that Rita be given an additional period of reunification services, and that Blaine be placed with Rita for a 60-day trial visit as soon as her child care arrangements were finalized. In that regard, the social worker also noted that Rita had discussed her situation with her Wal-Mart supervisor, who had been "understanding of her situation" and arranged to give her a firm work schedule which allowed her to make child care arrangements.

SSA's report *again* reflected its concerns that Blaine's foster parents were attempting to undermine the reunification efforts. It noted that not only had

Rita complained that the foster mother was trying to "subtly sabotage" Rita's commitment to sobriety, but also that members of SSA's staff had reported the foster parents had attempted to "engage them in conversation critical of the [assigned social worker's] management of this case and of the biological parents." SSA's concerns about the foster parents' behavior even prompted it to consider removing Blaine from their custody. Ultimately, however, SSA determined the disruption of such a move would not be in Blaine's best interests—*despite a consensus opinion of SSA staff that the foster parents "were not in substantial agreement with the goal of Family Reunification."* (Italics added.)

The 12-month review occupied parts of five different days, but those days were spread over a four-week period. The P.'s, as Blaine's de facto parents, were represented by counsel at the hearing, and their counsel conducted a vigorous cross-examination of the social worker. He questioned the accuracy of the social worker's reports, his credentials, and his conclusions concerning the parents' compliance with their case plans and the stability of their housing. The P.'s also called their own witnesses in the proceeding, including a worker from the agency which placed Blaine with them, and Mrs. P. herself, as part of their challenge to the reliability of the social worker's reports. Despite those efforts, the court specifically found the social worker to be credible: "I find him very credible from the testimony . . . . I think there were several errors in the reports, but overall I just find him to be quite credible in his background and experience."

During the four week period in which the 12-month hearing was pending, only one significant thing occurred outside the courtroom, but it was one which substantially changed the court's evaluation of the case. On November 28, 2004, a Sunday, Rita was in bed with a headache. Blaine was not with her. Her adult daughter was present, however, and offered her a Tylenol. Rita agreed and the daughter brought her the tablet, which was actually a prescription tablet of Tylenol with codeine. Rita took it, and went to sleep.

The next day, Rita appeared for her usual drug test. She informed the testers that she had taken a Tylenol with codeine without realizing what it was, and they told her she should expect to test positive. They advised her to tell her social worker. Rita also informed her Alcoholics Anonymous (AA) sponsor about the incident as soon as she saw her at work. Rita informed her social worker about it when she next saw him the following Thursday for Blaine's usual Thursday to Sunday visit. The social worker allowed that visit

to go forth as expected, but decided there should be at least one monitored visit thereafter prior to the next court hearing.

The next court hearing was the final day of taking evidence for the 12-month review. Although Rita testified she did not know the tablet was other than an ordinary Tylenol when she took it, and the social worker testified he believed her, the court did not. The court concluded Rita had taken the prescription medication knowingly, and viewed it as a possible attempt at self-sabotage on the eve of regaining custody: "[t]here's a word for this to describe why people go through 18 months of testing clean, superstars, clean, about ready to have their case dismissed, and use . . . . It's most unfortunate." The court further stated that it had been "ready to grant [Rita's] request [for return of Blaine to her custody] in total, but things have changed."

Rita's and Rocky's counsel both argued that Rita's ingestion of the prescription medication was not, viewed in the context of her recovery as a whole, particularly significant. Prescription painkillers were never Rita's "drug of choice"; her ingestion of a single tablet did not devolve into something more significant; and even assuming she had done it intentionally (and Blaine were present), there was no evidence suggesting the conduct would have presented any substantial danger to Blaine's safety or well-being.

Counsel also referred the court to our recent decision in *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 [20 Cal.Rptr.3d 336], in which this court emphasized that juvenile courts cannot expect perfection from parents in dependency cases. As we stated in the opinion: "We are looking for passing grades here, not straight A's." (*Id.* at p. 790.) The court responded to that argument by declaring Rita had not earned even a passing grade: "How can I give mother a passing grade? On the eve when I wanted to return the child to the mother, she gives a dirty test. [¶] . . . [¶] That really jeopardizes mother's position, and I thought mother was doing so outstandingly. I was almost ready to rule last time. . . ."

Both the court and counsel were concerned that the many delays in the 12-month hearing had resulted in a situation where there were few options for significant further services. Even if the court were to continue services to the 18-month point, that review hearing would apparently be required to take place only a couple of weeks after the 12-month hearing was concluding. In that regard, Rita's counsel argued that the services, to the extent any were

still necessary, could be extended beyond the 18-month point, since the services provided during the six-to-12 month period had not proved to be reasonable.

Counsel's point was that the court's decision to block the social worker's discretion to begin a 60-day trial release of Blaine into Rita's custody, in response to minor's counsel's ex parte motion, had amounted to a de facto grant of the motion without due process. The court had curbed the social worker's discretion to promote the reunification effort without ever determining his plan constituted an abuse of discretion, and thus thwarted Rita's progress toward reunification. Counsel suggested the proper remedy for that error was to declare the reunification services for that period had not been reasonable, and to grant additional services on that basis. The court was uncertain it had that power, inquiring of counsel, "Are you confident of that position?" When she responded that she was, the court remarked: "Well, it's easy to say yes, but have you thoroughly researched it?" In the end, the court declined.

Instead, it took the matter under submission on December 14th, and ordered the parties to return to court on December 20, 2004, for its decision. On that date, the court announced it was terminating reunification services. The court also, however, expressly authorized SSA to continue drawing funds for the parents to continue their case plans, and specifically with their substance abuse. As the court explained, "the court is granting additional funds for further services that mother complete counseling. She went to her A.A. meetings. She went to her N.A. meetings . . . . This dirty test comes at a time which the court was considering returning the child to the mother. [¶] . . . Mother has made some gigantic steps. She has worked, and she had periods of sobriety; but at this time the court cannot find another way to come to a different conclusion, just based upon the evidence that the court heard."

The court also scheduled a hearing pursuant to section 366.26, to take place on April 19, 2004, but made clear it intended to consider returning Blaine to Rita's custody at that time. As the court stated, "The likely date *by which the child may be returned to and safely maintained in the home* or may be placed for adoption, appoint a legal guardian, place permanently with a relative, or placed in another permanent living arrangement, is 4/19/[2005.]"

The court specified that the social worker would have discretion to liberalize visitation between Blaine and Rita, and then clarified what it expected Rita to accomplish prior to the permanency hearing if she wanted to

have Blaine returned to her at that time. Its list included continued clean drug tests, additional drug counseling, and completion of a "personal empowerment" program.[3]

In its written minute order comprising its ruling, the court made the following additional comments: "The court finds mother to be very fragile, but she has completed her Alcoholics Anonymous meetings, her Narcotics Anonymous meetings and her counseling. But, she has made bad choices and she made one when she used codeine. She has a job, and for her a very good job. Mother also has housing and is no longer living in motels. [¶] When mother testifies the first time she was very credible. Then when she testified aft[er] a dirty test she was completely different. *This is a very troublesome case as minor likes caretaker very much.*" (Italics added.)

In the wake of that order, Rita petitioned this court for extraordinary relief. Rita's petition was opposed by minor's counsel and the de facto parents. SSA informed this court by letter that although it was "disappointed" by the court's decision to terminate reunification services against its recommendation, it did not consider that decision to be an abuse of discretion. It declined to file a brief on the merits.

## I

Rita's primary claim is that the court abused its discretion in terminating services, because it relied too heavily on the single dirty drug test, occurring after Rita had ingested the Tylenol with codeine, to establish that Blaine could not be safely returned to her custody. Rita relies upon *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322 [12 Cal.Rptr.3d 572]. In that case, this court reversed a trial court's decision that a child could not be safely returned to the mother, concluding it was not based on substantial evidence. "The question we face is not whether Mother has an unblemished drug testing record or whether Mother is a perfect parent. Rather, the question is whether substantial evidence supports the juvenile court's finding that returning the children to Mother's custody would create a substantial risk of physical or emotional detriment to the children. Substantial evidence does not support such a finding." (*Id.* at p. 1327–1328.)

---

[3] This is a difficult order to understand. A section 366.26 hearing does not provide an option of returning the child to the parents' custody. The only available outcomes in a section 366.26 hearing are: (1) terminating parental rights, and freeing the child for adoption; (2) identifying adoption as the goal and commencing efforts to locate an appropriate adoptive placement; (3) appointing a legal guardian for the child; or (4) placing the child in long-term foster care. In this case, what the court appeared to be doing was announcing an intention to consider changed circumstances at the hearing, *as though* a motion had been filed by Rita pursuant to section 388—essentially dispensing with the requirement of the motion. So we are uncertain whether the court was trying to temper the termination order somehow or merely assuage its impact on Rita.

Although we do not find *Jennifer A.* to be entirely on point, we agree with Rita that its basic message is apt. In *Jennifer A.*, the dependency case was not based upon mother's drug use. Although it became apparent during the pendency of the case that mother was an occasional marijuana user, SSA had never asserted that such drug use impaired her parenting abilities in any significant way. Thus, the court could not agree that evidence of imperfect drug testing was sufficient to establish any substantial risk of harm to the children. The instant case is different, because Rita's substance abuse is the primary problem that put Blaine into the dependency system. Drug and alcohol use clearly did impair Rita's ability to parent, and she does not contend otherwise. Consequently, a dirty drug test is of greater significance here than it would have been in *Jennifer A.*

That said, however, the sole issue to be determined here is still whether Rita's failed drug test, viewed in the context of this case, constituted substantial evidence that returning Blaine to her custody would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).) In the absence of substantial evidence demonstrating such detriment, the court was obligated to return Blaine to Rita's custody.

■ Moreover, as we explained in *David B. v. Superior Court, supra,* 123 Cal.App.4th at page 789, "[t]hat standard, while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." It must mean what it says: that return presents a *substantial* risk of detriment to the child.

Both minor's counsel and the de facto parents argue that other factors might have justified the court's refusal to return Blaine to Rita's custody. But the court made abundantly clear that it was unpersuaded by those other factors and had intended to return Blaine prior to Rita's dirty test. Indeed, the court made very clear that absent the dirty test, it viewed Rita as a veritable superstar of the reunification process and, but for the codeine, would have returned Blaine to her. Consequently, we too will focus on that incident in evaluating the "substantial risk of detriment" issue.

First, we agree that Rita's ingestion of the prescription Tylenol was a setback. She herself characterized it as a "relapse." But we cannot adopt the juvenile court's apparent uncritical assumption that all relapses are created equal. If we assume, as the juvenile court suggested, that Rita was engaging in a last minute bit of self-sabotage, we would be constrained to point out it was a *very little* bit. She did not, for example, decide to go out partying with

a bunch of drug-using friends as a "last hurrah" before resuming full-time custody. She also did not, upon recognizing she would have a dirty drug test, use that as an excuse to provide a *really* dirty test—or worse, to do that and then skip the testing entirely.

Instead, she slept off her headache and then resumed her life—going to work, reporting her mistake, and then drug testing the next day. Even assuming Blaine had been in her custody during that period, we cannot see how her ability to care for him would have been impaired by the conduct.

And we can't see how it bodes especially ill for her future. This incident is significant only if it is viewed as a likely first step in Rita's backslide into more serious drug use. And while such a progression is always possible, there is little (if any) indication that was happening here. Rita did not ignore or minimize the danger. She made no effort to argue (as some might) that her ingestion of a single prescription pain killer was insignificant. Instead, she discussed the incident with her AA sponsor, the drug testing personnel, and her social worker. Rita was, in other words, quite proactive in addressing the lapse.

Our ability to second-guess the trial court's call is severely limited, and we do not mean to suggest the court was required to ignore this incident entirely. To the contrary, the slight (but always present) danger that Rita's conduct might actually trigger a backslide certainly may have justified an additional supervision period—for example, the social worker suggested waiting 30 days after Rita's dirty test before beginning the 60-day trial release period— but it did not justify a complete reversal on the issue of whether Rita could safely parent Blaine. And where, as here, the trial court explicitly tells us mother had performed in an exemplary manner, SSA was satisfied with her performance, and *but for* this incident the court would have returned the child to her, we are in a near-unique position to evaluate the sufficiency of the evidence.

Here it was insufficient. The court erred in treating this incident as simply "a dirty drug test"—as though all dirty tests are the same. They are not. And the particular dirty test at issue in this case, arising as it did from Rita's ingestion of a single prescription pain killer to combat a headache—in the absence of any prior listing of prescription drug abuse—was simply insufficient to justify the court's conclusion that Blaine could not safely be returned to her custody.

## II

As a separate and independent basis for reversing the order, we conclude the juvenile court improperly considered the quality of the relationship between Blaine and the P.'s, his de facto parents, in reaching its decision to terminate reunification services. The court expressly stated in its minute order "[t]his is a very troublesome case as minor likes caretaker very much." While it is understandable the court would be concerned about Blaine's future, that consideration is simply not pertinent to the determination of whether Rita's reunification period should be brought to a close.

As explained in *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788 [42 Cal.Rptr.2d 200], " '[t]he focus during the prepermanent planning stages is preserving the family whenever possible [citation] whereas the focus after the permanent planning hearing is to provide the dependent children with stable, permanent homes.' (*In re Michael R.* (1992) 5 Cal.App.4th 687, 695–696 [7 Cal.Rptr.2d 139].)" Similarly, in *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706], the court noted that "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.]"

It is only after the court terminates services and orders a hearing pursuant to section 366.26, that attention turns to assessing the quality of the child's relationships with his or her guardians, or prospective adoptive parents. Section 366.21, subdivision (i), provides in pertinent part that "[w]henever a court orders that a hearing pursuant to Section 366.26 shall be held, it shall direct the agency supervising the child . . . to prepare an assessment that shall include: [¶] . . . [¶] (5) The relationship of the child to any identified prospective adoptive parent or legal guardian, the duration and character of the relationship, the motivation for seeking adoption or guardianship, and a statement from the child concerning placement and the adoption or guardianship . . . ."

In this case, the court jumped the gun a bit. It considered Blaine's relationship with his de facto parents as *part of* its decision to terminate services and refer the matter to a section 366.26 hearing. That was improper. And, in a case such as this, where the court's decision was so clearly an agonizing one, we cannot conclude the error was a harmless one.

It is entirely possible the unusual circumstances of this case, with the foster parents having been accorded de facto status and been so directly and

prominently involved in the 12-month hearing, tended to create the impression they and their relationship with Blaine were entitled to some greater consideration than would normally be given at that point in the proceedings. That concern prompts us to caution the juvenile court against allowing such an impression to take hold. If a judge as good as this one can fall into that trap, we presume anyone can.

■ The role of de facto parents is a limited one. Their participation is primarily intended to ensure the court has all relevant evidence, and they are allowed to take part because their intimate knowledge of the child's welfare may prove beneficial in the decisionmaking process. (*In re B. G.* (1974) 11 Cal.3d 679, 693 [114 Cal.Rptr. 444, 523 P.2d 244].)

Of course, the de facto status also recognizes that such persons have a distinct interest in the companionship, custody and care of the child (*In re B. G., supra,* 11 Cal.3d 679, 693), but such recognition in no way infuses that distinct interest with any independent relevance in the proceedings. As the Supreme Court explained, "[E]ven those who attain the status of de facto parenthood 'are not equated with . . . parents or guardians for purposes of dependency proceedings and standing to participate does not give them all of the rights and preferences accorded [parents or guardians]. [Citations.] . . . .' " (*In re Kieshia E.* (1993) 6 Cal.4th 68, 77 [23 Cal.Rptr.2d 775, 859 P.2d 1290], quoting *In re Rachael C.* (1991) 235 Cal.App.3d 1445, 1452 [1 Cal.Rptr.2d 473].)

Thus, neither the P.'s' obvious interest in and commitment to Blaine, nor the quality of their relationship with him, became relevant to the issue of whether Rita's reunification services should be terminated, merely because they had been afforded de facto status. Their status allowed them to be heard on the issue. But, their relationship could not, in and of itself, alter its analysis.

III

■ Finally, we concur with the argument made by Rita's counsel at trial, to the effect that Rita was essentially denied the full benefit of her reunification period when the court precluded the social worker from proceeding with a 60-day trial release. As the court explained in *In re Elizabeth R., supra,* 35 Cal.App.4th at page 1791, visitation is an important part of the reunification process: "the law is clear that reasonable services, most particularly visitation, must be provided." In fact, the general rule, stated in California Rules of Court, rule 1456(f)(4), is that "the court must order visitation between the child and the parent or guardian . . . *to be as frequent as possible,* consistent with the well-being of the child." (Italics added.)

In *In re Elizabeth R., supra,* 35 Cal.App.4th 1774, the court concluded reunification efforts could be extended beyond the 18-month period, in large part because the mother had been cut off from visitation during the final six-month reunification period, after her commitment to a mental hospital. As the court explained, the failure of SSA to arrange sufficient visitation would constitute grounds for concluding the services provided during the reunification period were unreasonable.

The same thing occurred in this case, albeit not through any fault of SSA. Instead, SSA was attempting to carry out the mandate of making visitation "as frequent as possible," and its efforts were thwarted. SSA initially suggested the visit at the time the 12-month hearing was intended to be commenced—August of 2004—and indicated it intended the visit to start as soon as the court ordered an additional period of reunification. Unfortunately, the review hearing was repeatedly continued, until SSA finally just notified the other parties of its intention to proceed with the visit in early October. Minor's counsel then filed the ex parte motion to prevent the visit from commencing, and the court effectively granted that motion by temporizing indefinitely.

Although the court's true intention was apparently only to defer the issue a few days, the subsequent continuances of the 12-month hearing converted that deferral into the full relief requested by minor's counsel. SSA was precluded, for a period of over two months, from commencing the visit, without any determination by the court that it would have been an abuse of its discretion to do so. Neither it nor Rita was ever given any opportunity to challenge the de facto restriction on visitation, and the visit never took place.

We conclude they had a significant impact on the case. If Rita had been given her trial release, the court would have had substantial additional information to assist it in evaluating her ability to care for Blaine prior to the conclusion of reunification. If the visit had gone badly, it may have provided substantial evidence to justify the conclusion Rita could not safely parent Blaine. On the other hand, if the visit had gone well, and Rita had proved herself generally able to handle the daily rigors of parenting, we presume the court would have had greater confidence in her even after the codeine lapse—especially since SSA was always in her corner.

By effectively denying visitation, the court denied the parties, and itself, valuable information to assist in determining whether Rita would be able to safely assume Blaine's care. That was error, and it convinces us the reunification services were not reasonable.

The petition is granted. The order terminating reunification services for Rita is reversed, and the hearing scheduled pursuant to section 366.26, is vacated. The court is directed either to release Blaine into Rita's custody (with supervision, if appropriate) or to offer her additional reunification services.

Moore, J., and Fybel, J., concurred.