Filed 2/27/14  V.T. v. Super. Ct. CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| V.T. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN MATEO COUNTY, <br><br> Respondent; <br><br> SAN MATEO COUNTY HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | A140497 <br><br> (San Mateo County Super. Ct. Nos. JUV73842, JUV81801) |

Petitioners K.L. (mother) and V.T. (father) petition this court for extraordinary writ review of a juvenile court order setting a selection-and-implementation hearing for their two daughters.  The parents argue that the juvenile court erred in concluding that (1) they received reasonable reunification services and (2) there was a substantial risk of detriment to their daughters if they were returned to the parents' custody.  We disagree and deny their petitions.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

Father moved to the United States in 1983, when he was a teenager.  He attended high school in the United States and can speak English, although he and mother speak

1

primarily Cantonese.  They lack high-school diplomas and are both semiliterate.  Mother has seven children, four of them with father.

The family had been the subject of 50 referrals to social-services agencies in both San Francisco and San Mateo Counties dating back to 2002.  The current proceedings were initiated after real party in interest San Mateo County Human Services Agency (Agency) received reports in the summer and fall of 2011 that the parents were neglecting the five children then in their care:  their 11-year-old and 10-year-old sons, their nine-year-old and two-year-old daughters, and mother's 15-year-old daughter from a previous relationship (father's stepdaughter).

We describe in some detail the course of the ensuing investigation and proceedings given the parents' claim that they were not provided with reasonable reunification services.  An investigating social worker reported that the home was "just filthy," the children were "very unkempt," and the children had obvious mental-health issues that the parents did not appear able to manage.  There were also concerns about alcohol abuse by father and domestic violence between mother and father.  Although the family had been receiving in-home services and family therapy for about a year, the parents were not showing progress, and the children were exhibiting behaviors that raised concerns about their mental health.  The children were also arriving at school dirty and stinking, and there were concerns that the children were not being adequately fed.  At one point, the 11-year-old son reportedly threatened his nine-year-old sister with a knife and said he was going to kill her, but the parents minimized the incident.  A social worker worked with the family on a "safety plan" to keep knives out of the children's reach, but knives were later found in a drawer that was easily accessible to the children.

On October 4, 2011, the Agency filed five separate juvenile dependency petitions under Welfare and Institutions Code section 300.[1]  This writ proceeding concerns only

---

[1] All statutory references are to the Welfare and Institutions Code.

the parents' two young girls, who are now five and almost 12 years old.[2]  For clarity, we shall refer to them as the younger daughter and the older daughter.  In the dependency petitions, the Agency alleged that the older daughter had said she wanted to kill herself; that the younger daughter had been observed to be unattended, underdressed or naked, and with heavily soiled diapers; and that they both were exposed to filthy living conditions and were inadequately fed.

All five children were detained in shelter care in October 2011.  The older and younger daughters were formally ordered detained by the juvenile court on October 11, 2011, and they have remained placed together out of their parents' physical custody ever since.

Amended petitions filed on November 16, 2011, added allegations that the parents had unresolved mental-health issues and struggled with domestic violence and managing their anger.  According to the petitions, the parents suffered these problems despite having previously received two years of family services in San Francisco as well as six years of services in San Mateo County.  Later in November, the juvenile court granted the Agency's request that the older daughter be given psychotropic medication to treat her depression and ordered the parents to undergo mental-health evaluations.  Supervised therapeutic visitation began.  The parents' psychological evaluations were conducted in Cantonese, and a Cantonese-speaking Agency community worker attended visits to provide interpretation services.

During the first few months of the proceedings, the older daughter acted out in her foster home and at school, where she threatened to kill herself, ran out of her classroom, screamed, and refused to participate in classroom activities.  She had extreme and dangerous emotional meltdowns, and law enforcement had to be called four times in response to her unsafe behavior.  She also had an outburst during a therapeutic family visit in December, when she kicked and pushed chairs and tables, rolled around on the

---

**2** In November 2013, the juvenile court ordered a hearing regarding whether to terminate jurisdiction over the teenaged daughter because she would soon turn 18.  The parents' two sons are the subject of a separate appeal (No. A140377).

floor crying and screaming, and urinated on herself. A psychological evaluation revealed that the older daughter showed signs of an attachment disorder and depression. The daughter ultimately was diagnosed as having post-traumatic stress disorder (PTSD) with psychotic features, and she was found to have disorganized, insecure parental attachments. She qualified for a special-education program based on being evaluated as suffering emotional disturbance.

The younger daughter appeared to be comfortable in the foster home, but the social worker reported that she showed signs of mental-health issues, as she suffered severe temper tantrums during which she banged her head on the floor and threw her body against walls and furniture. Her teeth showed signs of serious decay.

At a hearing on January 13, 2012, the juvenile court ordered that father be referred for therapy. A Cantonese-speaking therapist was assigned to provide therapy for the parents, and their first session was scheduled for February 3. The parents continued to receive services, including therapeutic visitation with a Cantonese-speaking interpreter present, but, for reasons that are unclear, individual therapy conducted in Cantonese did not begin until later that year.

Following a contested jurisdictional hearing, the juvenile court sustained the amended petitions on March 7, 2012. The court found that the older daughter was a child described by section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage), and it found the younger daughter to be a child described by subdivisions (b) and (j) (abuse of siblings). Later that month, the juvenile court adjudged the older and younger daughters dependent children and placed them in out-of-home care. The court ordered reunification services for the family, including therapeutic visitation, English classes, and behavioral-cognitive therapy.

The parents and children participated in therapeutic visitation for a total of 10 months, and the parents made progress. At the conclusion of their therapeutic-visitation services in July 2012, the therapist reported that the parents had reached "basic goals" and "their potential[,] given their limited capacity." She recommended that the parents could benefit from learning parenting skills that were "tailored to their cognitive abilities

4

and level of functioning." Although the parents had demonstrated that they could maintain a clean and hygienic home, the social worker continued to be concerned about the parents' lack of awareness of their children's mental health and emotional needs and about father's anger-management issues and frustration with his children's needs. Moreover, although the parents were consistent with visitation and behaved appropriately during visits, the visits were held in a controlled setting, with an average of only three children at a time, and it was unclear whether the parents could handle all five children at once in an unsupervised setting.

The juvenile court continued the minors as dependents following a review hearing on June 14, 2012, and it ordered the social worker to submit a memorandum to the court regarding "the therapist for the parents, visitations of the children, [and] therapy for the children." At a hearing on September 25, the juvenile court sanctioned the Agency for not filing "the report in the case" (presumably, a reference to the memorandum it had previously ordered). (Underlining omitted.) The Agency was ordered to provide all counsel with all visitation and social-worker notes from June 14 to the date of the hearing.

In August 2012, the parents started family therapy together in Marin County (where their two sons were placed) and attended 90-minute sessions every other week. The two therapists who jointly led the sessions reported that the parents were unclear why their children had been removed from their care and what they needed to do in order to reunify with them, and they participated in therapy because of the court's order and not because they understood the problems they needed to address. The parents also participated in family therapy with the older daughter and younger daughter, along with their teenaged sister.

The social worker reported that he made several efforts to secure individual therapy for the parents, but securing the therapy was difficult because the parents lacked health insurance and there were few available therapists who spoke Cantonese. The social worker eventually was able to locate a Cantonese-speaking therapist, who was

available through a private contract, and the first individual therapy sessions were scheduled for October 13, 2012.

The private contract was canceled, however, after the social worker was told to try again to find a community-services provider. After contacting multiple service providers, the social worker located a Cantonese-speaking therapist who could provide individual cognitive-behavioral therapy. In early November 2012, both mother and father began receiving weekly individual therapy sessions conducted in Cantonese.

Although the Agency was providing reunification services to the family, it did not recommend that the children reunify with their parents. In reports submitted to the juvenile court in advance of a review hearing, the social worker wrote that there were still "serious concerns" that the parents lacked understanding about the risk and detriment to which the children previously had been subjected. Moreover, recent evaluations revealed that the parents suffered their own mental-health issues, and they were "inept to meet the emotional and physical needs of any of the children at th[at] point." The younger daughter suffered developmental delays that were attributed to the neglect she suffered while in her parents' care. The Agency recommended that the minors remain dependents of the juvenile court and remain in out-of-home placement.

The juvenile court continued the minors as dependent children following an interim hearing on October 9, 2012, and it permitted increased visitation if the minors' counsel agreed. Following the review hearing held on November 15, the juvenile court continued the minors as dependent children, found that the parents' progress toward addressing the issues that led to dependency was adequate, and concluded that reasonable services had been provided to the parents.

Although a transcript of the November 15 hearing does not appear in the record, it is clear that the parties present at the hearing entered into a lengthy stipulation. The juvenile court ordered that the terms of the stipulation be filed with the court, which was done on December 5. According to the written stipulation, the parties agreed that the juvenile court could continue the 18-month review hearing scheduled for May 15, 2013, to November if the court found that (1) the parents had made significant progress in

6

resolving the problems that led to the children's removal from their home and (2) there was a substantial probability that the children would be returned to the parents' physical custody within the extended period of time. The parties also agreed that visitation could be increased to four hours each week in the parents' home or other mutually agreed-upon location. As part of the stipulation, the parties agreed that the court should make several findings, including that "[r]easonable services designed to aid the parent to overcome the problems, which led to removal, have been provided or offered to the parent(s), including: therapeutic visitation, supervised visitation, referrals to additional therapeutic services, psychological evaluations, shelter care services, transportation services including monthly [C]lipper cards, ongoing risk assessment, translation services, and ongoing case management." (Underlining omitted.) The juvenile court adopted the stipulation by order dated December 7, 2012.

The parents' Cantonese-speaking counselor reported in January 2013 that mother and father were open and cooperative, and they found the sessions to be "one of the few encounters they have experienced where they did not feel judged and marginalized." Father reportedly was "very motivated and ha[d] shown remarkable ability to process information once it is presented to him in a culturally competent manner." The counselor further reported that the "parents' outlook on life has been more positive and their world view is more aligned with the main stream culture and both of them have been developing skills and tools to cope with the stress of being semi-literate in a world full of words they do not understand." The therapy sessions were held on the same day as family visitation. The four-hour visits were broken into two segments, with the teenaged daughter present the whole time, the boys arriving and leaving earlier, and the older and younger daughters arriving and leaving later. All five siblings were present for two hours.

Based on the parents' progress, the Agency recommended in January 2013 that the parents continue to receive reunification services. At an interim review hearing on January 31, the juvenile court granted the Agency discretion to allow therapeutically

supervised visits in the home with all the children. Supervised home visits with all five siblings and the parents began on March 3.

The parents continued to attend individual therapy, and the counselor reported that mother and father continued to participate and learn during their sessions. The counselor worked with the parents at developing safe parenting skills and learning "progressive discipline." For example, he observed that the parents often tolerated their children's misbehavior until they reached a "boiling point," then "unleash[ed] punishment that sound[ed] like ultimatums." He worked with them to improve their ability to address their children's behavioral issues immediately before the issues escalated. The parents also participated in family therapy with the older and younger daughters, working on trust, safety, setting boundaries, and improving communication.

Because the parents continued to benefit from services and to make progress, the juvenile court agreed at the review hearing held on March 21, 2013, that the matter should be continued to May. The court also granted the social worker discretion to allow unsupervised visitation, including overnight visitation, though the older and younger daughters never had such a visit. The family continued to have weekly visits in the home, supervised by the parents' individual therapist.

The parties' goal was to take a "step-down approach" to gradually reduce services, in order to determine if the parents were capable of reunifying within the additional time granted to them. At an interim review hearing on June 25, 2013, the juvenile court granted the social worker discretion to allow unsupervised visitation between the parents and the older and younger daughters, after discussing it with the daughters' attorneys. Again, no such unsupervised visitation ever took place with the older and younger daughters because of events that took place after the "step-down" in services.

Problems surrounding visitation occurred over the summer. The older daughter reportedly told her foster mother that she did not want to see father for a scheduled visit in late June because he would "yell 'mean things in Chinese' to her." She did, however, wish to see mother. When the visit took place, the older daughter told the social worker privately that the visit was not going well and that father had called her "crazy" when she

said she wanted to return home to her foster mother (an allegation father later denied).[3] The older daughter also told the social worker that she wanted to see mother but no longer wanted to see father.

During a subsequent visit on July 7, father became angry and cursed at an employee in a fast-food restaurant the family visited, apparently over an issue having to do with a coupon. According to the social worker's report, father "began to scream, swear, and stormed out of the building. The father stayed outside of [the restaurant], appearing upset, and walked back to the house not waiting for the family. Upon the family's return to the home, the mother explained the coupon issue, and the father again swore loudly in Chinese." Father later discussed the incident in therapy, and his therapist worked with him on recognizing the things that trigger father's anger.

The social worker recommended that the family not move to unsupervised visitation for the older and younger daughters, and that the older daughter's statements about father be addressed in a therapeutic setting. The social worker questioned whether mother understood the extent of her children's mental-health needs.

A clinical psychologist evaluated the younger daughter, then four years old, in July and August 2013. The psychologist found that the younger daughter no longer showed signs of PTSD, but she still displayed signs of a possible attachment disorder. She also had problems with speech articulation, but those problems did not appear to be the result of any developmental disabilities. The psychologist reported a "low probability" that the parents had achieved fundamental changes in their parenting skills. She reported that mother's "passive and schizoid traits" were still present in a visit on August 9,[4] and she was concerned that returning the younger daughter to her parents would be detrimental, as it might result in the daughter regressing. In general, "little

---

[3] The parents' Cantonese-speaking therapist later explained that the older daughter, who is not fluent in Cantonese, may have misunderstood father, who was speaking in Cantonese.

[4] By contrast, the parents' individual therapist who had been treating them since November 2012 testified that he had not observed schizoid traits in mother.

emotion" was displayed by either the child or her parents at the beginning and end of the visit.

The social worker likewise expressed concern that returning any of the children to the parents' care would be detrimental for them. Although the parents had participated in therapy and maintained a clean living environment, the social worker doubted whether they were capable of meeting the "extreme needs" of their five children, including their mental-health issues. In a report dated August 28, 2013, the social worker recommended that the minors be continued as dependents of the court and that the parents continue to receive reunification services until November. The report noted that the Agency would provide a final recommendation for permanency at that time.

At a hearing on August 28, 2013, father's counsel raised "grave concerns" about reunification services that had been provided since the previous hearing on August 1. The parents were struggling with transportation issues after having recently moved from Daly City to Oakland, and they had not had any visits with the older and younger daughters since the move. The social worker explained that the parents had been provided with transportation passes, and she explained why a few recent visits had been canceled. After a lengthy discussion over logistics and scheduling issues, the matter was continued.

The older daughter told the social worker in early September that she was happy with her foster mother and wanted to stay in her foster home. The daughter said she hoped to return to her parents "one day," but she wanted to stay with her foster mother in the meantime. Her therapist reported that the older daughter had made "huge improvements academically, socially, and emotionally while with the foster mother." The younger daughter also was doing well in the foster mother's care and in preschool, and she was on track to start kindergarten the following year.

A clinical psychologist who conducted updated psychological evaluations of the parents in Cantonese did not support immediate reunification. He found mother to be "evasive and selective" when discussing the reasons the Agency removed her children from her care. He likewise found that father downplayed safety issues the children had

10

faced, such as one of the brothers threatening the older daughter with a knife while the children were still living with their parents. The psychologist reported that father appeared "impulsive," had "difficulty with the legal system," and "felt resentful of demands imposed on him after his acting out behavior." Father did not appear to be remorseful about his actions; instead, he was indignant about being treated unfairly. The psychologist was concerned that although the family home was currently clean, other reasons for the children's removal remained, and he recommended weekend overnight visits for the children on a trial basis.

A different clinical psychologist evaluated the parents' four children (but not mother's teenaged daughter, who remained a dependent of the juvenile court) and found that they all still had significant mental-health needs. As for the older daughter, the psychologist found she had made "remarkable" progress, and she now projected positive self-esteem and no longer appeared to be having suicidal thoughts. Moreover, her symptoms of PTSD were less intense. As for the younger daughter, she no longer showed symptoms of PTSD, and she demonstrated the potential to form new attachments. She appeared comfortable in her current placement, but she displayed signs of anxiety after visits with her parents. By contrast, the Cantonese-speaking therapist who had been treating the parents since November 2012 reported that the parents had made progress, and they had demonstrated the ability to have their children returned to their care, with family-maintenance services. The therapist described the parents as "open and cooperative" and reported they had demonstrated positive parenting techniques.

The Agency recommended that the minors be continued as dependents of the juvenile court and that reunification services be terminated because the parents had not progressed to a point where they could handle unsupervised visitation, except with the teenaged daughter.

Around October or November 2013, the older daughter's behavior started to regress after visits. She stated that father was "culture crazy," and she was upset by comments he had made about her mental health and her weight. The woman who had been the older and younger daughters' foster mother for more than a year reported that

11

both girls had become "extremely sullen" after recent visits and would cry afterward. After one visit, the younger daughter came home wanting "preferential treatment," because her father had told her that "she was a princess and [the older daughter was] not." This made the older daughter "very angry," and both daughters yelled and screamed at each other. After a different visit, the younger daughter came home crying and upset and told her foster mother, "I have to choose my parents." After yet another visit, both the younger and older daughters returned to their foster home visibly upset, and both of them began crying when asked about the visit. The girls started having trouble sleeping and showed other signs of stress.

A contested 18-month review hearing was held over five days in November 2013. At the time of the hearing, the parents were living in a one-bedroom home. They had downsized from a four-bedroom home because, after the minors were removed from their care, they became ineligible for a larger housing subsidy. Father testified that he intended to apply for a larger subsidy if his children were returned to his care.

At the hearing, the parents' attorneys repeatedly focused on whether services appropriate to the parents' cultural needs had been provided. Father's counsel asked the social worker overseeing the case whether the worker knew "if any service provider currently providing services to this family other than [the Cantonese-speaking therapist] who is knowledgeable of the Chinese culture and how it impacts integration into the American society." The social worker responded that she could not speak to other providers' "knowledge of the Chinese culture."

Mother's counsel asked the clinical psychologist who evaluated the minors whether she had taken continuing-education courses about the "psychology of Chinese people." The psychologist acknowledged that she was not "an expert in psychology of Chinese people," but she testified that she had taken cultural-sensitivity classes that covered Asian cultures, evaluated several Chinese families, and consulted with Chinese-American psychologists about cultural issues. When questioned by mother's counsel whether mother's withdrawn nature during family visits might be explained by cultural factors, the psychologist testified that "as far as active parenting and being involved,

12

quite the opposite is my impression as far as academic in Chinese parents." The psychologist also testified that mother's lack of involvement and "fixation on the computer screen" demonstrated an unavailability that was "atypical I think for a mother in any cultur[e]." She concluded that the parents had not made sufficient progress in their ability to relate to their children, a conclusion that was "based on all that I have learned from the children, from the records that I reviewed and that parent observation is just a small piece of that. But no data [was] brought to my attention that indicates the parenting style has changed or that there has been a break through in recognition of the deficiencies."

The older daughter's individual therapist, who also coordinated in-home services for both the older and younger daughters, testified that the older daughter's significant behavioral issues had reduced both in frequency and intensity during the time she was outside of her parents' care. According to the therapist, the parents had worked in family therapy on their communication skills and "boundary settings." Although the parents had become more receptive to feedback, their attendance had been inconsistent, and their goals had not yet been met.

Father testified at the hearing through an interpreter. When asked whether he had an understanding of American culture, he testified, "Not really because I live in circle of Chinese people." Whereas the younger daughter had recently started individual therapy because of concerns that she was exhibiting "a lot of anxiety," father testified that he did not believe the younger daughter had any mental-health needs. When asked whether the older daughter had needs that were different from the needs of the average 11-year-old girl, father answered, "I don't know," though he later testified that he understood his children needed therapy. Father also acknowledged that he had neglected taking care of his children, but he attributed it to cultural reasons, testifying that "I did not understand what would be required in terms of the American standards in taking care of the children and that's because I grew up in Chinese culture."

A psychologist who had worked with the parents as far back as 2005 and had diagnosed father with narcissistic personality disorder testified as an expert in clinical

psychology, as well as in the area of "clinical psychology in the Chinese culture." She testified that she had recommended at the beginning of 2012 that the parents receive therapy in Cantonese because father would be better able to identify with such a therapist. She acknowledged that psychological evaluations conducted by a therapist using an interpreter are "widely done," but she explained that using an interpreter makes the assessment more difficult. She acknowledged that the minors had "very serious emotional issues and they require a lot of supervision and treatment."

The Cantonese-speaking therapist who had been treating mother and father since November 2012 testified at the hearing as an expert in the area of Chinese culture. He explained that Chinese parents tend to be more reserved and have trouble verbally expressing their affection for their children. They also have trouble showing physical affection to their children with hugs and kisses because they are afraid they will spoil their children, who will be "unable to be successful in life when they grow up." Chinese people tend not to make eye contact, according to the therapist, because it is a sign of disrespect. He also explained that there is a concern in the Chinese culture with "losing face," which means that even where people know they are wrong, they "are still going to try to hold out to the bitter end because they feel by admitting that they are wrong that they are losing face."

The therapist explained that cultural differences did not account for the parents' history of severe neglect of their children, but it explained their previous failure to benefit fully from reunification services. One of the therapist's goals in working with the parents was helping them to understand why their children had been removed from their care and to accept responsibility, and he testified that they currently understood "the conditions that le[d] to removal and they are vigilant not to repeat those conditions." When asked by one of the minor's attorneys whether father had acknowledged that any specific behavior led to removal, the therapist testified, "He understands that according to the American standards those are considered neglectful acts. But he continues to provide explanation as to how these events came to be. This goes back to the fact that he externalize[s] a lot of this blaming and he needed time to process and accept that to say

14

okay I have a responsibility as a parent that when children stink they need to be bathed. I have a responsibility that when one sibling threatens the other I need to give them time and space." He further testified that mother had acknowledged that her house previously was "filthy" and that it should be clean in the future.

The therapist further testified that father was concerned with "losing face," and he also was distrustful of the government, which made it hard for him to internalize what he was told by Agency social workers. After work in therapy, father had fewer "explosive outbursts" and was better able to control his temper. Both parents had improved their ability to physically and verbally display affection toward their children, though father was still working on making eye contact with his children and on not speaking so loudly to them, which is often done by Chinese persons who are "of lower education strata" and who "tend to communicate by large volumes, high volumes." Mother had made "substantial progress in terms of her self image and self worth," which benefits her children because "by giving herself a positive self image she is able to then teach her daughters what positive self image is about." Both parents had gained skills in setting boundaries and applying appropriate discipline, instead of resorting to yelling. Their new approach had led to decreased tantrums by the children during visits.

As for whether the parents could reunify with their children, the therapist testified that he believed that both parents were currently able to care for their children and handle their mental-health needs, and he did not see any risk of harm to the children if they were returned to the parents' custody, assuming they continued to receive services.

The juvenile court found the parents' therapist to be "generally credible," but stated that "I think he thinks the situation has improved more than I think it has" and that the therapist was "giving them [the parents] too much credit for insights and improvement that I don't see in the rest of the evidence here." The court found by clear and convincing evidence that the children could not be returned home because return of the children would create a substantial risk of detriment to their emotional well-being. The court noted that the minors' improvement could be attributed to their removal from the home and that "disrupting that would be detrimental particularly to put them back in a

15

home where I'm still not satisfied that there has been a significant improvement in parenting skills. The mother appears to me to still have from the evidence some unresolved mental health issues. The father still lacks some insight." The court praised father for the work he had done to improve his parenting skills but found that it was "just too little too late." As for the older daughter, the court found that her mental health had improved, but she still demonstrated signs of PTSD and behavior disorders, and disrupting her current placement "would be very detrimental to her well-being."

The court also found by clear and convincing evidence that the services provided had been reasonable. While acknowledging that it might have been preferable for the parents to have a Cantonese-speaking counselor throughout the proceedings, the court found that the services the parents did receive were "provided by very professional persons, several of whom testified here and appeared to be very sincere in the efforts that they made, appeared to have a good handle on the children's needs and their evaluations of the parents." The juvenile court scheduled a selection-and-implementation hearing (§ 366.26) for the older and younger daughters, and mother and father timely sought extraordinary writ relief.

## II.
### DISCUSSION

### A. Substantial Evidence Supports the Juvenile Court's Finding that the Agency Provided Reasonable Reunification Services.

Mother and father argue that the juvenile court erred when it found that the Agency had provided reasonable services, a claim that we review for substantial evidence. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598; *In re Alvin R.* (2003) 108 Cal.App.4th 962, 970-971; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) In so doing, we construe all reasonable inferences in favor of the juvenile court's findings regarding the adequacy of services and the reasonableness of the agency's efforts. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 46; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

16

At the 18-month review hearing, the juvenile court must determine whether reasonable reunification services have been provided. (§ 366.22, subd. (a); see also Cal. Rules of Court, rule 5.708(m) [court may not set hearing under § 366.26 unless finding is made by clear-and-convincing evidence].) "The adequacy of reunification plans and the reasonableness of the [social services agency]'s efforts are judged according to the circumstances of each case. [Citation.] Moreover, the [social services agency] must make '[a] good faith effort to develop and implement a family reunification plan.' " (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) " 'The effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success.' [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed).' " (*Id.* at pp. 1164-1165, original italics.)

Substantial—indeed, overwhelming—evidence was presented that the parents received reasonable reunification services under the circumstances. Father, in particular, complains about the delay in finding a Cantonese-speaking therapist for the parents before November 2012. But the juvenile court made a finding that same month that the Agency had provided reasonable services up to that point, and all parties agreed that those services included therapeutic visitation, supervised visitation, referrals to additional therapeutic services, psychological evaluations, shelter-care and transportation services, ongoing risk assessment, translation services, and ongoing case management. Neither parent challenged the court's conclusion—in fact, they both *stipulated* to it—and it was adopted by the court in December.

Following the court's finding, the family continued to receive reasonable services, including therapeutic visitation, family therapy, and individual therapy. By all accounts, the parents' Cantonese-speaking therapist was an outstanding resource, and he helped

17

mother and father improve their parenting skills. In arguing that they did not receive reasonable services during this time, mother and father complain that although there was a Cantonese-speaking interpreter present during family therapy with their young daughters, the family therapist did not speak Cantonese. Their Cantonese-speaking counselor was, however, present during family visits, and he helped the parents work on their parenting skills after observing them during visitation.

In any dependency case, the services provided are rarely perfect. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Ibid.*) Here, substantial evidence supports the juvenile court's finding that they were reasonable under the circumstances. Accordingly, we reject the parents' arguments.

> B. *Substantial Evidence Supports the Juvenile Court's Finding that the Daughters Would Face a Substantial Risk of Detriment if They Were Returned to the Parents' Custody.*

At the 18-month hearing, "the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a); see also *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) The detriment standard, " 'while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' It must mean what it says: that return presents a *substantial* risk of detriment to the child." (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505, original italics.) In making its determination, the court shall consider the "efforts or progress, or both, demonstrated by the parent," as well as "the extent to which he or she availed himself or herself of

18

services provided." (§ 366.22, subd. (a); *Blanca P.,* at p. 1748.) The Agency had the burden of establishing detriment. (§ 366.22, subd. (a); *Blanca P.,* at p. 1748.)

In concluding that the Agency had met its burden here, the juvenile court focused on the danger to the children's emotional well-being, concluding that moving them from their stable placements back to their parents would place them at risk of regressing in the progress they had made to partially resolve their serious mental-health issues. Mother and father argue that the juvenile court was incorrect, a claim we again review for substantial evidence. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.)

We acknowledge that evidence was presented below, and now highlighted by the parents in their writ petitions, that the parents made progress. They showed cooperation and motivation to participate in services, made progress on their case plans, improved their parenting skills and interactions with their children during supervised visits, and maintained a clean home. But this progress must be evaluated in light of *all* the evidence presented at the 18-month hearing. This evidence showed that the parents never progressed to unsupervised visits with the daughters, both of whom continued to show signs of mental-health problems; the parents continued to demonstrate a lack of understanding about the extent of their children's issues, such that a return to their care likely would lead to regression; and the daughters became distressed after recent visits with the parents.

Given this evidence, the cases upon which mother and father rely are easily distinguishable. For example, in *Rita L. v. Superior Court*, *supra*, 128 Cal.App.4th 495, the appellate court held it was error for the juvenile court not to have returned a child to her mother—who was found to have performed " 'outstandingly' " during the reunification period (*id.* at p. 498)—*solely* because she inadvertently took a prescription pain killer, which led to a dirty drug test. (*Id.* at pp. 501-502, 506.) Here, by contrast, the parents' progress was not as clear, and the risk of potential harm to the children was substantial. We reject mother's argument that the juvenile court impermissibly took into account her daughters' relationships with their current caretaker, as the court did in *Rita L.* (*Id.* at p. 507.) It is true that the juvenile court mentioned how much the girls had

19

improved in their foster mother's care. But this observation was made in the context of how detrimental it would be to move them *to* the care of the parents, and the court did not weigh the foster mother's specific relationships with the girls, as the court did in *Rita L.* (*Id.* at pp. 507-508.)

The juvenile court found that the parents' progress on their case plan had been adequate. But it does not follow, as mother and father argue, that compliance with their case plan necessarily overcomes a finding of detriment. Father relies on *Jennifer A. v. Superior Court*, *supra*, 117 Cal.App.4th 1322, which held that a parent is "not required to demonstrate perfect compliance" with a reunification plan. (*Id.* at p. 1343.) But in that case, and unlike here, the noncompliance was found to be minimal, and the record as a whole showed that the mother had sufficiently addressed the underlying reasons her child was removed from her care, which was "in stark contrast to so many other dependency cases [such as this one] that have reached the stage of the permanency hearing." (*Id.* at pp. 1342-1343, 1345.)

Our power to "second-guess" the juvenile court's ruling "is severely limited." (*Rita L. v. Superior Court*, *supra*, 128 Cal.App.4th at p. 506.) Given the substantial evidence in the record of a substantial risk of detriment to the older and younger daughters if they were returned to their parents' care, we decline to second-guess the juvenile court here.

### III.
#### DISPOSITION

The petitions for extraordinary writ relief are denied. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452(h).) The request for a stay of the selection-and-implementation hearing scheduled for March 3, 2014, is denied as moot. This decision shall be final immediately in the interests of justice. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____

Humes, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.