Filed 8/3/21  In re A.A. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.A.,<br><br>Defendant and Appellant. | F082509<br><br>(Super. Ct. No. 19CEJ300376-3)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County. Elizabeth Egan, Judge.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Poochigian, Acting P.J., Smith, J. and Meehan, J.

## INTRODUCTION

At a combined jurisdiction and disposition hearing, the juvenile court declared then three-month-old A.A. a dependent under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1),[1] ordered her removed from mother's and father's physical custody under section 361, subdivision (c)(1), and ordered reunification services for both parents.  R.A. (father) appeals the removal order.[2]  He claims the juvenile court committed prejudicial error when it failed to consider reasonable alternatives to prevent or eliminate the need to remove A.A. from his physical custody.  (§§ 361, subds. (c)(1)(A)–(B), (e).)

The juvenile court read its findings into the record but did not "state the facts on which the decision to remove [A.A. was] based."  (§ 361, subd. (e).)  However, the error complained of is harmless on this record and, therefore, we affirm the removal order.

## FACTUAL AND PROCEDURAL BACKGROUND

### Referral

A.A. was born in November 2020, and she lived in an apartment with mother, father, and her two half brothers, D.G. and J.G., then 15 and 14 years old, respectively.[3]  Mother was the primary caregiver for the children while father worked outside the home.

The family had eight prior referrals dating back to 2014 that were deemed inconclusive or unfounded, several of which were based on mother's alcohol use.  In November 2019, D.G., then 14 years old, and J.G., then 13 years old, were removed from the home due to mother's alcohol use, and, in January 2020, they were declared dependents of the juvenile court and removed from mother's physical custody.  When A.A. was born in November 2020, that dependency case was in the reunification phase

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     J.L. (mother) is not a party to this appeal.

[3]     R.A. is not the father of D.G. or J.G.

with a 12-month permanency hearing scheduled in December 2020. (§ 366.21, subd. (f)(1).) Mother had progressed to unsupervised, extended visitation with D.G. and J.G., and was making "significant progress" in the assigned social worker's opinion.

The current proceeding involving A.A. arose from a referral on December 9, 2020, alleging general child neglect and alcohol intoxication by mother. Social workers with the Fresno County Department of Social Services (the department) made contact with mother at her residence after she allegedly behaved oddly during a telephone contact. Mother denied drinking, but social workers observed her behavior was odd and her eyes appeared large. D.G. and J.G. initially stated everything was fine, but while social workers were outside the apartment and after the Fresno Police Department had been called for assistance, D.G.'s and J.G.'s care provider contacted a social worker with the foster care agency to report that D.G. was on the phone with her, crying and requesting to be picked up because mother was "being combative and violent with him." D.G. thereafter reported to social workers on the scene that mother was intoxicated, combative, and behaving violently toward him, and he handed over a sealed bottle of whiskey and a half-empty bottle of whiskey, which he identified as belonging to mother. D.G. had several scratches on his neck, back, and arms allegedly inflicted by mother, and D.G. and J.G. stated that mother had been drinking since A.A. was born.

Father was at work at the time. He was contacted by telephone by a police officer and later, at father's request, by a social worker. Father acknowledged mother's past issues with alcohol use, denied there were any issues when she was pregnant, and stated mother seemed fine to him.

D.G. and J.G. were removed from the home, and A.A. was taken into protective custody. The three children were placed together in a licensed foster care home.

**Section 300 Petition**

On December 11, 2020, the department filed a juvenile dependency petition alleging that A.A. came within the juvenile court's jurisdiction under section 300,

subdivision (a) (risk of serious physical harm) as to mother and subdivision (b)(1) (failure to protect) as to mother and father.

**Detention Hearing**

On December 15, 2020, following a one-day continuance, the juvenile court found a prima facie showing had been made that A.A. was a person described by section 300 and ordered A.A. detained from both parents. The court directed the department to provide mother and father with supervised visitation at the department's discretion, parenting classes, evaluation and treatment for substance abuse, mental health and domestic violence assessments, and random drug testing. A combined jurisdiction and disposition hearing was set for January 19, 2021.

**Jurisdiction and Disposition Report**

The jurisdiction and disposition report prepared by the department recommended that the juvenile court sustain the petition allegations, adjudge A.A. a dependent of the court and to remain out of mother's and father's care, provide father with reunification services, and deny mother reunification services.

Mother reported during a team decision making meeting that she drinks vodka and Jack Daniels. Mother admitted she hit D.G. on December 9, 2020, stated she was not happy, and stated father did not really know anything. During a family reunification bypass panel meeting on January 13, 2021, mother reported she began drinking on weekends with friends when she was 18 years old and her consumption increased two years ago. She denied drinking daily, but said she binge drinks and she relapsed on November 29, 2020.

Father stated he became suspicious that mother was drinking a few days before December 9, 2020, but he did not have proof. He said he occasionally drinks one or two beers after work, and he occasionally smelled alcohol on mother's breath when he kissed her. However, he did not bring the subject up, because he thought it was "rude" given he did not have proof. He denied any awareness that mother had relapsed.

4.

D.G. reported that mother is addicted to alcohol, even after a year of rehabilitation; she drinks 15 to 20 ounce bottles of liquor (vodka or Jack Daniels) and "gets" two bottles at a time; and he is afraid of her when she is drinking. D.G. stated that prior to December 9, 2020, mother had recently begun drinking and would pass out on the floor; that he and J.G. found mother passed out on the bathroom floor that week; and that mother was letting A.A. cry and just staring at her. D.G. and J.G. were taking turns caring for A.A. due to mother's intoxication. On December 9, 2020, mother was drinking Jack Daniels and not being attentive to A.A. When D.G. tried to take the bottle away from mother, she started kicking, scratching, slapping, and punching him, and she kicked him in the mouth. D.G. stated that mother had never punched him before the incident on December 9, 2020, but on that date, he was "mother's 'punching bag,'" she "'beat the shit out of [him],'" and he had "'never been more scared of a person.'"

J.G. reported that mother had been drinking for approximately two weeks prior to December 9, 2020, and that week, her drinking became "rampant" and occurred the entire week. He stated that when mother consumes a half-bottle of Jack Daniels, she becomes unpredictable and violent, and she does not listen, but when she consumes vodka, she becomes happy and dances around the house. J.G. stated he feels unsafe when mother drinks and would only feel safe if she was sober.

D.G. and J.G. reported that mother and father engage in verbal domestic violence in front of the children, and they feel unsafe when mother drinks because she becomes violent.

Mother had five supervised visits with A.A. via Zoom between December 15, 2020, and January 8, 2021. She asked the care provider questions about A.A.'s well-being and medical appointments, and she asked the provider to take care of A.A. Mother expressed affection for A.A. and was emotional at times, expressing her loneliness without her children and her hurt.

5.

Father did not attend those scheduled visits because of his work schedule. The social worker attempted to contact father three times, but he did not make himself available.

Mother and father were scheduled for Concurrent Planning Orientation and placed on a waiting list for parenting classes.

Mother and father did not attend their substance use evaluations and were in the process of being rescheduled.

Mother had a positive drug test on November 20, 2020, and she missed eight drug testing appointments in December 2020. She enrolled in random drug testing in January 2021, and subsequently tested negative twice.

Father failed to register for random drug testing and he was re-referred.

Mother and father did not attend their domestic violence evaluations, and they were re-referred.

Mother's and father's mental health evaluations were pending.

Mother declined to waive her family reunification services or relinquish her parental rights. The social worker was unable to reach father and mailed a letter requesting he make contact.

A.A. was in a licensed foster home with her siblings with a concurrent plan for adoption by the current care provider. On December 11, 2020, A.A.'s paternal aunt (aunt) requested A.A. be placed with her and aunt was provided with Resource Family Approval Orientation information on January 14, 2021, but as of the report date, aunt had not submitted an application.[4]

---

[4] The jurisdiction and disposition report was submitted to the juvenile court on January 15, 2021.

**Jurisdiction and Disposition Hearing**

A combined and contested jurisdiction and disposition hearing commenced on February 23, 2021. On February 24, 2021, the juvenile court continued the matter to prepare a ruling and on March 2, 2021, the court issued its ruling.

Mother testified first. She stated that when D.G. and J.G. were removed from the home in 2019, she was employed and caring for them without help from family. After their removal, she engaged in parenting classes, child abuse classes, an outpatient program, and therapy. D.G. and J.G. were in foster care in 2019 and most of 2020. In November 2020, visits progressed to liberal in-home visitation, and her drug tests were negative.

After A.A. was born, mother took care of her. D.G. and J.G. helped care for A.A., but mother denied she turned over care of A.A. to them. She testified she began drinking two or three weeks after A.A. was born. She was feeling depressed and sought medical help in January 2021. Her doctor diagnosed her with postpartum depression and prescribed medication, which she was taking. Mother testified that after A.A. was removed from the home, she missed some of her scheduled referral appointments in December because she left town to see her parents. She informed the social worker before leaving. Mother entered a detoxification program in February 2021 and was engaging in group classes; a domestic violence treatment program; AOD education; codependency, health and wellness classes, and relapse prevention classes. She was also seeing a counselor one-on-one once a week and was being drug tested randomly.

On cross-examination, mother testified that she did not let her social worker know she relapsed and did not reach out to any contacts from her previous treatment program. At the time of her testimony, she had been sober for several weeks. She testified that father worked 12-hour days and he was unaware of her relapse because she did not drink around him, and she showered and brushed her teeth before he arrived home.

7.

Mother called Melissa Valenzuela, the social worker assigned to D.G.'s and J.G.'s dependency case, to testify. Valenzuela stated that mother was cooperative, but other individuals had called with concerns that mother had not shared with Valenzuela. These incidents, which included reports that mother passed out at work and passed out behind the wheel of her car, led to D.G.'s and J.G.'s removal in November 2019. After their removal, Valenzuela received another call that mother had shown up to work intoxicated and had father's son with her. Mother began engaging in testing and services in March 2020, and after mother made significant progress, Valenzuela recommended extended visitation. Valenzuela discovered mother's relapse on December 9, 2020, although she had some suspicions when she visited mother the day before because she observed mother to be disheveled with large pupils and mother was not speaking the way she usually spoke.

Mother had a positive drug test in November 2020 and after that, she failed to show up for drug testing through December 2020. Mother did inform Valenzuela she was leaving to visit her parents, but Valenzuela told mother she could neither direct mother to stay nor give mother permission to go. Valenzuela advised mother that she would be deemed a no-show for her scheduled appointments if she left.

With respect to D.G. and J.G., Valenzuela recommended terminating mother's services in December 2020, but because A.A.'s case was new, she believed she was required to recommend reunification services for mother and did so. She subsequently learned otherwise and changed her recommendation. She testified it was not in A.A.'s best interest to reunify with mother due to safety concerns. She recommended father be provided with reunification services, however.

Father testified last. He was gone 12 hours a day, five days a week, for work. He stated that when A.A. was born, he was aware of mother's past history with alcohol, but he was not concerned she was drinking and he denied knowing she had relapsed prior to

8.

A.A.'s removal. He stated that had he known, he would have sought help to address the problem.

On cross-examination, father testified he did not ask mother about her drinking because it was in the past and he did not want to be negative. He said D.G. and J.G. did not mention mother's drinking to him and although he and mother lived together, she was behaving normally and he had no reason to think she was drinking. He stated he would not drink in front of mother once she was released from her program and he had not realized the sensitivity of that issue. He expressed confidence mother could finish her program and remain sober, and he stated he would be supportive of her and prioritize her sobriety.

Father objected to the reunification services offered. He stated he did not do anything wrong and he did not understand why A.A. was removed from his custody. He had not considered having a back-up plan for A.A.'s care because he had no reason to think one was necessary. On redirect, he testified that if A.A. was returned to him, he would arrange for childcare because "[t]hat is [his] responsibility."

Regarding the department's position that he was not responding to contact attempts, father testified on redirect that the issue was "a continuous roadblock" and he stated that the department had his work number based on past contacts, but kept calling his cell phone, which he did not carry with him at work. Father was not visiting with A.A. in foster care and he stated on redirect that he had not visited her because he did not "want to subject [himself] to that exposure to [his] daughter in that situation." He explained it was very emotional and hard for him to see her in foster care when she should be at home with him, and he did not understand how he failed in a way that led to her removal.

The juvenile court sustained the petition as to the allegations against mother (counts a-1 and b-1) and found A.A. was as described by section 300, subdivisions (a)(1) and (b)(1). However, the court found the allegation against father (count b-2) not true.

9.

The court found by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection or physical, or emotional well-being of A.A. if she was returned home, and there were no reasonable means by which her physical health could be protected without removing her from her parents' physical custody. The court found minimal progress by both parents toward alleviating or mitigating the causes necessitating A.A.'s placement in foster care. The court ordered A.A. removed from the custody of her parents under section 361, subdivision (c)(1), and ordered supervised visitation and reunification services be provided for both parents.

## DISCUSSION

### I. Legal Standards Governing Removal

Section 361, subdivision (c)(1), provides, in relevant part, "A dependent child shall not be taken from the physical custody of his or her parents … with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence [that].… [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's… physical custody." "The court shall consider, as a reasonable means to protect the minor … [¶] [t]he option of removing an offending parent," or "[a]llowing a nonoffending parent … to retain physical custody as long as that parent … presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (*Ibid.*)

Subdivision (e) of section 361 provides that "[t]he court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home," and "[t]he court shall state the facts on which the decision to remove the minor is based."

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this

10.

discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104; accord, *In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652.)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332; accord, *In re I.R.* (2021) 61 Cal.App.5th 510, 520.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170; accord, *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.)

The removal order must be supported by substantial evidence (*In re I.R.*, *supra*, 61 Cal.App.5th at p. 520; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 154), and the applicable clear and convincing evidence standard of proof "'requires a finding of high probability[]'" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998; accord, *In re I.R.*, *supra*, at p. 520). "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, at pp. 1011–1012.)

## II.    Error Complained of Harmless

On appeal, father argues that the juvenile court failed to consider reasonable alternatives to removing A.A. from his physical custody, such as having mother leave the home or enter rehabilitation, or having aunt care for A.A. while father was at work.  He claims that as a result, the court's finding is not supported by substantial evidence, entitling him to reversal of the removal order and remand to allow the court to assess reasonable alternatives to removal.  The department contends that the court's removal order is supported by substantial evidence and any error in failing to specifically address or discuss reasonable alternatives is harmless.

In the detention report, the department stated that "the child was not considered safe in her parents' care," and "due to the imminent danger at the time of removal, … placement was the only intervention possible for the child."  Further, the department documented that "[t]here are no relatives to consider for placement."  In the jurisdiction and disposition report, the department reiterated there are no relatives to consider for placement, "[t]here would be a substantial risk to the physical health, safety, protection, and emotional well-being of the child, [A.A.], if she were returned to the care of her parents … at this time" and "[t]here are no reasonable means by which the child's physical health  and well-being can be protected without removing [her] from [mother's and father's] custody."

In removing A.A. from mother's and father's custody, the juvenile court read the department's proposed orders into the record, stating, "There is clear and convincing evidence that continuance of the child in the home of the parents is contrary to the child's welfare.  [¶]  There is or would be a substantial danger to the physical health, safety, protection or physical or emotional wellbeing of the child if the child were returned home, and there are no reasonable means by which the child's physical health can be protected without removing the child from the parent's physical custody.  [¶]  Reasonable efforts have been made to prevent or eliminate the need for removal of the child from the

12.

home and to make it possible for the child to return to [her] home. [¶] Continued placement of the child is necessary and the child's current placement is appropriate. [¶] The Court has considered placement with relatives and cannot make a determination at this time."

The juvenile court is required to "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) "'[O]ur dependency system is premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests.' (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530.) 'The requirement for a discussion by the child welfare agency of its reasonable efforts to prevent or eliminate removal [citation], and a statement by the court of the facts supporting removal [citation], play important roles in this scheme.' (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 810 (*Ashly F.*).) 'Without those safeguards there is a danger the agency's declarations that there were "no reasonable means" other than removal "by which the [children's] physical or emotional health may be protected" and that "reasonable efforts were made to prevent or to eliminate the need for removal" can become merely a hollow formula designed to achieve the result the agency seeks.' (*Ibid.*)" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1066–1067 (*D.P.*).) Therefore, "merely recit[ing] the findings the juvenile court must draw from the supporting facts to order removal under section 361[]" falls short of satisfying the statutory requirement. (*Id.* at p. 1067; accord, *Ashly F.*, *supra*, at pp. 809–810.)

However, the error is prejudicial and requires reversal "only when the appellate court, after examining the entire case, is of the opinion that '"it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."'" (*D.P.*, *supra*, 44 Cal.App.5th at p. 1068; accord, *Ashly F.*, *supra*, 225 Cal.App.4th at p. 811; *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137, overruled on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748,

13.

fn. 6.) "A '"probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.'" (*D.P.*, *supra*, at p. 1068.)

A.A. was only one month old when she was placed in protective custody due to mother's relapse into alcohol abuse and three months old at the time of the disposition hearing. Father was absent from the home 12 hours of the day, five days a week, and A.A.'s half brothers, then 14 and 15 years old, had been caring for A.A. in father's absence due to mother's intoxication. D.G. and J.G. reported that in addition to passing out on the floor and sleeping due to alcohol intoxication, mother would just stare at A.A. while she cried. Further, when mother drank Jack Daniels, she became violent and on the day of the referral, she physically attacked and injured D.G.

Although mother had relapsed to the extent that she was unable to care for A.A. and was passing out in the home due to intoxication, which necessitated mother's other two minor children to step in, father denied any awareness of the relapse, stated he had no concerns she was drinking, and did not discuss mother's past drinking issues with her because he did not want to be negative. He also testified he had not been aware that his own drinking was a trigger for mother and he failed to engage in reunification services, including visitation with A.A., because he considered it too emotionally difficult and he did not believe he had done anything wrong warranting the department's intervention. Further, when questioned regarding the department's difficulty reaching him, he faulted social workers for calling his cell phone rather than his work number. This testimony indicates a lack of insight into the nature and extent of mother's problem with alcohol use; a lack of insight into the danger to A.A., who was entirely defenseless and reliant on mother for care given her young age; and a lack of responsiveness to the conditions that led to A.A.'s removal.

At the time of the hearing, mother had removed herself from the home to participate in a rehabilitation program. However, mother's and father's relationship remained intact and mother intended to return home after completing her program. A.A.

14.

was unable to communicate or protect herself given her age and father, who was gone from the home for extended periods while he worked, was unable to act as A.A.'s primary caregiver. Nor did he claim otherwise. Rather, father gave vague testimony that he would arrange for childcare because "[t]hat is [his] responsibility," and he failed to offer evidence of any plan that demonstrated his ability to protect A.A. if he had physical custody of her. (§ 361, subd. (c)(1)(B).)

Under these circumstances, the juvenile court's removal order is supported by substantial evidence and the court's failure to state or discuss the facts underlying the order was harmless, as there is no reasonable probability of a different result had the court done so. (Cf. *D.P.*, *supra*, 44 Cal.App.5th at p. 1069 [juvenile court erred in removing minor from the mother's custody without stating supporting facts and error was prejudicial where the minor and the father lived in the home and the mother lived elsewhere under a restraining order; had court reflected on and stated the facts, it was reasonably probable it would have concluded it was unnecessary to remove the minor from the mother's custody given the mother's removal from the home and the protection of the restraining order]; *Ashley F.*, *supra*, 225 Cal.App.4th at p. 810 [failure to consider "unannounced visits by [department], public health nursing services, in-home counseling services and removing [the] Mother from home" prejudicial error].)

Father contends the decision in *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495 (*Rita L.*) supports his claim of reversible error, but we disagree. In that case, the appellate court reversed the juvenile court's order terminating reunification services based on an isolated transgression by the mother where she ingested a single Tylenol with codeine, provided by her adult daughter, while she was bedridden with a headache. (*Id.* at p. 498.) The juvenile court noted that the mother "had performed 'so outstandingly' during her reunification period," and the incident did not escalate into drug use or suggest the minor would have been endangered had he been in the mother's custody at the time. (*Ibid.*) The court had intended to return the minor to the mother's custody prior to this

incident, and the appellate court found that the single incident, viewed in the context of the case, was insufficient to support the conclusion the minor could not be returned safely to the mother's care. (*Id.* at pp. 506–507.)

This case, in contrast, does not involve a minor, isolated incident that constituted a "last-minute stumble in the effort to remain drug free." (*Rita L.*, *supra*, 128 Cal.App.4th at p. 498.) To the contrary, mother was in the reunification phase of D.G.'s and J.G.'s dependency proceeding that arose from alcohol use when she fully relapsed into drinking regularly and excessively to the point of passing out. In addition, mother was the primary caregiver for A.A. and father was not available to care for A.A. himself because he was away from home for significant portions of time due to his job. Thus, the facts here are not analogous to those in *Rita L.*, and, on this record, we find no reversible error and we affirm.

## DISPOSITION

The order removing A.A. from father's physical custody under section 361, subdivision (c)(1), is affirmed.